UNITED STATES of America,
Plaintiff,

v.

Cynthia EDWARDS, Defendant.

No. 72–CR–1310.

United States District Court,
E. D. New York.

June 13, 1973.

Robert A. Morse, U. S. Atty., for plaintiff, by David DePetris, Asst. U. S. Atty., Brooklyn, of counsel.

Paul Goldberger, New York City, for defendant.

ZAVATT, Senior District Judge.

The defendant, indicted and charged with the crime of possessing with intent to distribute 1,600 bags of heroin in violation of 21 U.S.C. § 841(a)(1), moves to suppress "all of the evidence seized" by a United States Marshal at La-Guardia Airport on the evening of August 23, 1972. A hearing on said motion was held before me on April 23, 1973, at which the defendant, Deputy United States Marshal Alan J. Loeffler (Loeffler) and Walter O'Connor (O'Connor), Chief of the F.A.A. Air Transportation Office at LaGuardia Airport, testified.

The defendant arrived at LaGuardia Airport on August 23, 1972 at approximately 9 P.M. for the purpose of boarding an Eastern Airlines shuttle flight to Boston, Massachusetts. Tickets for such flights are not sold at the airline counter. Rather, they are sold to passengers by an airline employee after the passen-

gers have boarded the plane. The airplane for this particular flight was standing in close proximity to Boarding Gate 5.

Passengers boarding a plane at Gate 5 walk along a hallway and line up at a point near the entrance to the boarding gate. At this point there are two printed signs, each 2½ feet by 1½ feet—one on the wall of the hallway and the other on a stanchion facing the boarding passengers, each of which reads as follows:

[Seal of the United States]

### AIRCRAFT HIJACKING IS A FEDERAL CRIME PUNISHABLE BY DEATH

### CARRYING CONCEALED WEAPONS ABOARD AIRCRAFT IS PUNISHABLE BY PRISON SENTENCES & FINES

### PASSENGERS AND BAGGAGE SUBJECT TO SEARCH

Federal Aviation Administration
U.S. Department of Transportation

Both signs are located at points before a passenger passes through the magnetometer field. A United States Marshal is stationed at a desk immediately forward of a magnetometer field, from which location he can observe a positive reading of the magnetometer as a passenger enters the field. In addition, when an Eastern Airlines employee (stationed at the boarding gate) announced over a loudspeaker system that passengers for the instant flight could board the plane, he also announced that all carry-on luggage would be searched. On the evening in question, a magnetometer was functioning as a screening system to prevent or deter the carriage on board the aircraft of any sabotage device or weapon in carry-on baggage or on or about the person of each boarding passenger.

37 Fed.Reg. 2501, 14 C.F.R. § 121.538 (issued Jan. 31, 1972, effective Feb. 2, 1972) required all certified air carriers and commercial operators operating large aircraft to adopt and put into use, within 72 hours, such a screening system. 37 Fed.Reg. 4904–5, 14 C.F.R. § 121.538(g) (issued Feb. 9, 1972, effective March 6, 1972) authorizes the F.A.A. Administrator to amend any screening system or any security program approved by him "upon his own initiative if he determines that safety in air transportation and the public interest require the amendment. . . ." Following the statement of the President on July 7, 1972 about the security problem attendant upon air-shuttle flights, the Administrator issued an order on July 18, 1972, with reference to passenger screening of non-reservation type flights in which he prescribed minimum acceptable procedures "effective immediately":

"1. WHERE METAL DETECTORS ARE AVAILABLE

A. Each certificate holder shall prevent the carriage aboard its aircraft of baggage on or about the person of passengers unless that baggage has been examined by a responsible representative of the certificate holder or a law enforcement officer and,

B. The certificate holder shall require each passenger to clear through a metal detector without indication of unaccounted for metal on his person prior to boarding.

## 2. WHERE METAL DETECTORS ARE NOT AVAILABLE

A. Each certificate holder shall prevent the carriage aboard its aircraft of baggage on or about the person of passengers unless that baggage has been examined by a responsible representative of the certificate holder or a law enforcement officer and,

B. The certificate holder shall require each passenger to present two acceptable forms of identification.

C. In the case of a passenger who does not provide adequate identification, the certificate holder may request that passenger to submit to a consent search of his person and,

D. The certificate holder shall deny boarding to each passenger who fails to cooperate.

The above procedures must be included in the security programs of the affected air carriers. Principal security agents shall immediately notify the carriers of the procedural changes indicated above."

Since the promulgation of that order of the Director, Eastern Airlines has maintained a magnetometer at Gate 5, requires all shuttle flight passengers to pass through its field and examines all carry-on luggage of all such boarding passengers.[1]

At approximately 9:50 P.M. on August 23, 1972, Deputy United States Marshal Loeffler (who was assigned to "Air Piracy" at LaGuardia) was stationed at Gate 5. He was monitoring the magnetometer and examining the carry-on luggage of all boarding passengers. He observed the defendant standing in the line of boarding passengers and carrying a bag. (The defendant described it as a "beach bag.") As she walked through the magnetometer field, Loeffler observed the magnetometer give a "positive reading"; "a blue light came on." When he observed this positive reading, he identified himself as a United States Marshal and asked the defendant if she would consent to a search of her carry-on baggage. She said "yes." The defendant testified that she did not remember Loeffler saying anything to her; did not recall seeing any signs about searching carry-on baggage; did not recall any announcement to the effect that all such baggage would be searched. She did recall, however, seeing Loeffler search the pocketbook carried by a person ahead of her in the line of boarding passengers.

Loeffler placed the defendant's pocketbook and beach bag on the table at which he was located and examined them. He first examined the contents of the pocketbook which contained keys, some hard currency and perfume in containers with metal caps. Then he searched the beach bag. It contained two pairs of slacks and some folding match covers. One pair of slacks (green) was wrapped around a package. He felt the package and asked the defendant what it was. She replied that it was a box of Tampax. It is apparent that the defendant was attempting to bluff the Marshal, in the hope that he would not be so ungallant as to examine what she had described as an item of feminine hygiene. The bluff failed when Loeffler removed the slacks; observed an unsealed brown paper bag; looked into it and observed a large number of glassine envelopes, each containing a white powder. He also found additional similar envelopes in the outside pockets of the beach bag. In all, Loeffler found 1,653 such envelopes. The defendant testified that she did not know exactly how many such envelopes were in her beach bag; that there about 1,600 and that she knew that they con-

---

1. On December 5, 1972, the Administrator issued a directive, dated the same day and effective January 5, 1973, requiring the inspection of carry-on baggage items and a detection device, or a personal search, of all boarding passengers on all air transportation, "because of the continuing menace of air piracy and other crimes aboard aircraft and because of the serious nature of this threat to the safety of persons and property."

tained heroin—approximately one to two ounces. Loeffler then asked the defendant for identification. She produced a Social Welfare card issued to one Carolyn Edwards. (It was later learned that Carolyn Edwards is the name of the defendant's sister.) At this point Loeffler detained her; made a field test of the contents of the glassine envelopes; found that they contained heroin and thereupon placed her under arrest. After her arrest he found the defendant's identification card in her pocketbook. It is to be noted that no arrest was made until after the contraband had been discovered.

In her moving affidavit, the defendant admitted that her beach bag contained "a quantity of narcotics in glassine envelopes" in "a brown paper bag" and that the Marshal felt this brown paper bag with his fingers before he opened it; she denied that the Marshal "asked for permission to search said bag." At the hearing, however, she testified merely that she didn't "remember the Marshal saying anything to me." In her moving affidavit, she also alleged that "at no time after she was stopped was your deponent given an opportunity to leave the boarding area without being searched." And at the hearing she testified that she would not have boarded the plane if given the opportunity not to do so "because I knew I had the drugs in my bag." The court finds that the defendant knew that the carry-on luggage of all passengers was being searched; that she had not yet committed herself to board the plane, since she had not yet purchased a ticket for that flight; that she was as free to step out of the line of passengers (as she had been to enter that line) if she did not want her baggage to be searched.

No evidence was introduced at the hearing to even suggest that the search by Loeffler was not conducted in good faith for the purpose of preventing hijacking or like damage or that the scope of the search was not reasonable. Further, the defendant had been given advance notice of her liability to such a search. Nor does the defendant contend that the use of the magnetometer constituted an unreasonable search—a contention made in United States v. Bell, 464 F.2d 667, 673 (2d Cir. 1972), which the Court held to be "baseless". "In view of the magnitude of the crime sought to be prevented, the exigencies of time which clearly precluded the obtaining of a warrant, the use of the magnetometer is in our view a reasonable caution." *Id.*

■ The search and seizure in the instant case was reasonable and did not offend any Fourth Amendment rights of the defendant.

"The Founders banned only 'unreasonable searches and seizures.' Determination of what is reasonable requires a weighing of the harm against the need. When the object of the search is simply the detection of past crime, probable cause to arrest is generally the appropriate test. On the other hand, when 'a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous,' a lower standard prevails. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, [20 L.Ed.2d 889] (1968). The threatened criminal activity in *Terry* was the burglary of a store. When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air." *Id.* at 675 (footnote omitted).

\*    \*    \*    \*    \*    \*

"Due to the gravity of the air piracy problem, we think that the airport, like the border crossing, is a critical zone in which special fourth amend-

ment considerations apply. It is the one channel through which all hijackers must pass before being in a position to commit their crime. It is also the one point where airport security officials can marshal their resources to thwart such acts before the lives of an airplane's passengers and crew are endangered. In applying *Terry* were we to hold that airport security officials must always confine themselves to a 'pat down' search where there is a proper basis for an air piracy investigation, we think that such a per se restriction in the final analysis would be self-defeating. We have already pointed out that the hijacker can conceal explosives or weapons in places which might be overlooked in the course of a cursory pat down. It should be emphasized that such a search is not primarily for the investigating officer's protection, but rather for the protection of a distinct and uniquely threatened class—this nation's air carriers, their crews and passengers." United States v. Moreno, 475 F.2d 44, 51 (5th Cir. 1973).

\* \* \* \* \* \*

"In the context of a possible airplane highjacking with the enormous consequences which may flow therefrom, and in view of the limited time in which [the Marshal] had to act, the level of suspicion required for a *Terry* investigative stop and protective search should be lowered." United States v. Lindsey, 451 F.2d 701, 703 (3d Cir. 1971).

*See also* United States v. Epperson, 454 F.2d 769 (4th Cir.), cert. denied, 406 U. S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972), noted 7 U.Richmond L.Rev. 362 (1972); United States v. Mitchell, 352 F.Supp. 38, 42–43 (E.D.N.Y.1972); *Note,* Airport Searches, 47 St.John's L. Rev. 276–94 (1972); *cf.* United States v. Schafer, 461 F.2d 856 (9th Cir.), cert.

denied, 409 U.S. 881, 93 S.Ct. 211, 34 L. Ed.2d 136 (1972) (allowing an airport search at Hawaii for interdicted infested plants).

■ Furthermore, the court finds that the defendant consented to a search of her beach bag and handbag. Defendant contends that, even after being warned of her liability to search by sign and by public announcement, she had to be personally warned of her liability to search and she had to be advised that she had a right not to consent upon the condition that she not board the airplane before being searched at the ramp.[2] *See* United States v. Meulener, 351 F.Supp. 1284 (C.D.Calif.1972). But this warning is not a condition precedent to valid consent in this Circuit:

"There have been, at the very least, hints or suggestions in the legal literature that a variant of the *Miranda* warnings, 384 U.S. 436, [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), required in the context of waiver of Fifth and Sixth Amendment rights, should be required when law enforcement agents seek a waiver of Fourth Amendment rights, *see* United States v. Nikrasch, 367 F.2d 740 (7 Cir. 1966); Note, Colum.L.Rev. 130 [sic] (1967). We have declined to embrace such a rule in the past, stating that '[t]o fulfill the purpose of the fourth amendment—controlling police conduct—it is unnecessary to adopt a rule that a search is per se invalid unless it is preceded by warnings as to fourth amendment rights. The courts are competent to determine whether valid consent has been given absent such warnings,' United States ex rel. Combs v. LaValee, [sic] 417 F.2d 523, 525 (2 Cir. 1969), cert. denied 397 U. S. 1002, [90 S.Ct. 1150, 25 L.Ed.2d 413] (1970); United States v. Marotta, [D.C., 326 F.Supp. 377, aff. 456 F.2d 1336 (2 Cir.)] *supra.* We de-

---

2. Here, in contrast to United States v. Lopez, 328 F.Supp. 1077, 1093 (E.D.N.Y. 1971), the defendant had no reason to think herself in custody. She was not led away or asked to accompany Marshals to

a private area away from the ramp. She was merely subjected to the identical procedure which she saw taking place to a passenger in front of her.

cline to do so again today. Other courts are in agreement, taking the view that failure to advise a person of the right to withhold consent is simply one factor to be considered in the balance, *see e. g.*, Rosenthall v. Henderson, 389 F.2d 514, 516 (6 Cir. 1968)." United States v. Mapp, 476 F.2d 67 (2d Cir. 1973).[3]

The defendant's motion to suppress "all of the evidence seized" is denied.

This is an order.

---

3. *Accord*, United States v. Sicilia, 475 F.2d 308, 311 (7th Cir. 1973); People v. DeStrulle, 104 Calif.Rptr. 639, 642 (1972). *See also* United States v. Jones, 475 F.2d 723, 731 (5th Cir. 1973).

It is to be noted that in *Mapp, supra*, the defendant was already under arrest in her own home at 2:00 A.M. when, without any warnings, she allegedly consented to a search of her bedroom closet and that it was in this factual context that the court held that "failure to advise a person of the right to withhold consent is simply one factor to be considered in the balance." The court regards any statement to the contrary in United States v. Clark, 475 F.2d 240, 247 (2d Cir. 1973) as dictum, inconsistent with the holding of the Court in United States v. Mapp, *supra*.