**UNITED STATES of America,**
**Appellee,**

v.

**Cynthia EDWARDS, Appellant.**

**No. 575, Docket 73-2488.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 20, 1973.

Decided May 29, 1974.

J. Jeffrey Weisenfeld, New York City (Goldberger, Asness, Feldman & Breitbart, New York City, of counsel), for appellant.

David DePetris, Asst. U. S. Atty. (Edward John Boyd, V, Acting U. S. Atty., E. D. New York, and L. Kevin Sheridan, Asst. U. S. Atty., of counsel), for appellee.

Before FRIENDLY, HAYS and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from a conviction following a non-jury trial for possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) is another in the growing list of cases relating to the validity of airport searches.[1] Problems have multiplied as practical considerations have required that the "profile" method, on the basis of which this court first upheld the validity of an airport search, United States v. Bell, 464 F.2d 667 (2 Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1972), should be relegated to a supplementary role [2] and that primary reliance should be placed on passage through a magnetometer [3] and the search of carry-

---

1. Footnote 1 to Judge Oakes' opinion in United States v. Albarado, 495 F.2d 799, at 801 n. 1 (2 Cir. 1974), lists 18 decisions by courts of appeals on this subject since the initial one in United States v. Lindsey, 451 F.2d 701 (3 Cir. 1971), cert. denied, 405 U. S. 995, 92 S.Ct. 1270, 31 L.Ed.2d 463 (1972). Three more can now be added, United States v. Crain, 485 F.2d 297 (9 Cir. 1973); United States v. Ogden, 485 F.2d 536 (9 Cir. 1973); and United States v. Palazzo, 488 F.2d 942 (5 Cir. 1974).

2. Within a few days after the decision in United States v. Bell, there occurred the first hijacking of a shuttle flight—for which the profile method is totally inapplicable.

3. Magnetometers have become increasingly sophisticated and are being used at a growing number of airports. Even where magne-

on luggage.[4] Although no one could reconcile all the views expressed in the opinions of the various circuits or, indeed, of this circuit alone, a consensus does seem to be emerging that an airport search is not to be condemned as violating the Fourth Amendment simply because it does not precisely fit into one of the previously recognized categories for dispensing with a search warrant,[5] but only if the search is "unreasonable" on the facts. This is altogether in line with the command of the first clause of the Amendment, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Surprise has been expressed that "the Amendment nowhere connects the two clauses; it nowhere says in terms that one might expect it to say: that all searches without a warrant issued in compliance with the condition specified in the second clause are *eo ipso* unreasonable under the first." Trial Manual for the Defense of Criminal Cases (Preliminary Draft No. 1, Sept. 29, 1966), Joint Committee on Legal Education of the A.L.I. and A.B.A., 28. But, as Professor Telford Taylor demonstrated in a brilliant lecture, Search, Seizure and Surveillance, this was not a lapse by the draftsmen. Rather "our constitutional fathers were not concerned about warrantless searches, but about overreaching warrants." [6] While the heavy judicial gloss that a warrantless search is invalid unless within an appropriate "exception" is surely here to stay, recognition of the historical background of the Amendment, with its stress on the seizure of books and papers on political affairs and the search of homes for illegally imported goods, helps to determine when an exception is justified. Nothing in the history of the Amendment remotely suggests that the framers would have wished to prohibit reasonable measures to prevent the boarding of vessels by passengers intent on piracy.

tometers are in use, however, there is considerable variation in the procedures when a passenger has activated the device, see United States v. Albarado, *supra*, 495 F.2d at 802 n. 3.

4. We are not here required to and do not consider what circumstances may justify the search of checked baggage, a procedure routinely followed by at least some airlines on international flights from the United States. Compare United States v. Garay, 477 F.2d 1306 (5 Cir. 1973), and United States v. Palazzo, *supra*, with United States v. Cyzewski, 484 F.2d 509 (5 Cir. 1973), relating to more particularized searches of checked baggage.

5. An analogy has been found in the border search, see United States v. Moreno, 475 F.2d 44, 51 (5 Cir.), cert. denied, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); United States v. Skipwith, 482 F.2d 1272, 1275 (5 Cir. 1973). However, the principle that seems most nearly applicable to the airport search is that recognized in Colonnade Catering Corp. v. United States, 397 U.S. 72, 76, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), and applied in United States v. Biswell, 406 U.S. 311, 314–317, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), sustaining warrantless searches of records maintained or products held by regulated industries. Such "administrative searches," conducted pursuant to a general regulatory scheme rather than an investigation to secure evidence of a crime, have regularly been upheld where the statutory procedures have been deemed reasonable. Cf. Wyman v. James, 400 U.S. 309, 318, 324–325, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); Downing v. Kunzig, 454 F.2d 1230 (6 Cir. 1972); United States v. Schafer, 461 F.2d 856, 858 (9 Cir.), cert. denied, 409 U.S. 881, 93 S.Ct. 211, 34 L.Ed.2d 136 (1972); United States v. Miles, 480 F.2d 1217, 1218–1219 (9 Cir.) cert. denied, 414 U.S. 1008, 94 S.Ct. 369, 38 L.Ed.2d 245 (Nov. 5, 1973). But since an attempt to fold airport searches under the rubric of this type of administrative search would entail the question of reasonableness, as well as the need for dealing with language in Almeida-Sanchez v. United States, 413 U.S. 266, 271, 93 S.Ct. 2535, 37 L.Ed. 2d 596 (1973), the issue of reasonableness may as well be faced directly.

6. Taylor, Two Studies in Constitutional Interpretation 41 (1969). Although the lecture was delivered early in 1967, unhappily it did not become available until 1969, and then under an unilluminating title. It is finally getting the attention it deserves, see United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771.

## I.

The facts are stated in Judge Zavatt's opinion, 359 F.Supp. 764 (E.D.N.Y. 1973), and we shall limit ourselves to the essentials. Defendant Cynthia Edwards arrived at La Guardia Airport in New York City on the evening of August 23, 1972, to take an Eastern Air Lines "shuttle" flight to Boston. The relevant regulations of the Federal Aviation Administration then in effect with respect to nonreservation flights such as the shuttle required that:

1. Where metal detectors are available

   A. Each certificate holder shall prevent the carriage aboard its aircraft of baggage on or about the person of passengers unless that baggage has been examined by a responsible representative of the certificate holder or a law enforcement officer and,

   B. The certificate holder shall require each passenger to clear through a metal detector without indication of unaccounted for metal on his person prior to boarding.[7]

Near the entrance to the boarding gate were two large printed signs, plainly warning, among other things,

PASSENGERS AND BAGGAGE SUBJECT TO SEARCH.

When an Eastern employee announced over a loudspeaker that the flight could be boarded, he also announced that all carry-on luggage would be searched.

At this time Miss Edwards was in the line of boarding passengers, carrying a pocketbook and what she described as a "beach bag." She activated the magnetometer—for what reason the record does not disclose.[8] The Deputy United States Marshal who examined the beach bag found that it contained, among other things, a pair of slacks wrapped around a package. In answer to the Marshal, Miss Edwards said the package was a box of Tampax. Removing the slacks, the Marshal found that in fact the package contained a large number of glassine envelopes, each containing a white powder. He later found other such envelopes in three pockets in the beach bag, bringing the total to 1,664. Miss Edwards testified she knew that there were about 1,600 envelopes in the bag and that the white powder was heroin. The alleged illegality of the search is thus the sole ground of the appeal.

Because of the simplicity of the facts, the appeal presents, in clear and uncomplicated form, the basic question whether the FAA regulations with respect to the search of carry-on baggage in force in August, 1972, violated the Fourth Amendment. There were here no makeweights, such as suspicious behavior; false identification, meeting of the "profile," and the like,[9] that have assisted the Government in cases such as United States v. Bell, *supra*, 464 F.2d 667; United States v. Riggs, 474 F.2d 699 (2 Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); United States v. Moreno, *supra*, 475 F.2d 44; and United States v. Skipwith, *supra*, 482 F.2d 1272. On the other hand, the search was strictly in accordance with the regulations; there was no removal of Miss Edwards to another area as in

---

7. Department of Transportation Press Release No. 103–72, dated December 5, 1972, extended these requirements to all flights. Where metal detectors were not available, the directive required that "each passenger [submit] to a consent search prior to boarding," 37 Fed.Reg. 25934 (1972).

8. Contrary to what is now the usual procedure, Miss Edwards was carrying her pocketbook and the beach bag when she passed through the magnetometer. Her pocketbook contained keys, coins and perfume containers with metal caps which could well have been responsible for activation. The marshal searched the pocketbook without finding weapons or contraband before searching the beach bag.

9. While the activation of the magnetometer would be a suspicious circumstance with respect to Miss Edwards' person and the pocketbook she was carrying, its pertinence to the beach bag had been attenuated to the point of exhaustion by the discovery that the pocketbook contained innocent objects capable of causing activation and no dangerous ones, see fn. 8.

United States v. Ruiz-Estrella, 481 F.2d 723, 724 (2 Cir. 1973); and the case presents no such questions concerning a search of her person as were considered in *Albarado*. There is likewise no suggestion that the marshal was acting in response to any tip that Miss Edwards was transporting narcotics rather than in a good faith effort to carry out the regulations.

■ In my concurring opinion in United States v. Bell, *supra,* 464 F.2d at 675, I wrote concerning searches designed to prevent airplane hijacking:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.

While that view was not accepted by a majority, neither was it rejected. Judge Mulligan, who wrote for the court, had no occasion to consider the question; while Judge Mansfield expressed some misgivings, the facts did not require him to consider the special problem of the conceded inapplicability of the "profile" method to shuttle flights. United States v. Ruiz-Estrella, *supra,* left the question open in this circuit since the majority there refused to infer on the basis of the record that the posters had apprised the defendant of his ability to avoid search by not boarding the flight, 481 F.2d at 728–729. Approving references to the view expressed in the concurring opinion in *Bell* have been made

in United States v. Doran, 482 F.2d 929, 932 (9 Cir. 1973), and United States v. Skipwith, *supra,* 482 F.2d at 1276.[10] We apply it on the facts here.[11]

■ The reasonableness of a warrantless search depends, as many of the airport search opinions have stated, on balancing the need for a search against the offensiveness of the. intrusion. We need not labor the point with respect to need; the success of the FAA's anti-hijacking program should not obscure the enormous dangers to life and property from terrorists, ordinary criminals, or the demented. The search of carry-on baggage, applied to everyone, involves not the slightest stigma, see United States v. Albarado, *supra,* 495 F.2d at 807. More than a million Americans subject themselves to it daily; all but a handful do this cheerfully, even eagerly, knowing it is essential for their protection. To brand such a search as unreasonable would go beyond any fair interpretation of the Fourth Amendment. If experience should demonstrate that the Government is abusing its authority and is using the airport search not for the purpose intended but as a general means for enforcing the criminal laws, a means for limitation can be found in the suggestion in Judge Aldrich's dissenting opinion in United States v. Skipwith, *supra,* 482 F.2d at 1280–1281. See also United States v. Davis, *supra,* 482 F.2d at 909–910 & n. 44. But unless and until there should be evidence of abuse, we hold to the traditional rule that if the search is proper, it is of no moment that the object found was not what the officer was looking for, Abel v. United States, 362 U.S. 217, 238, 80 S.Ct 683, 4 L.Ed.2d 668 (1960).

■ The factual element of knowledge of the ability to withdraw that was

10. In addition, Judge Browning reached essentially the same conclusion in his thorough opinion for the court in United States v. Davis, 482 F.2d 893, 910–912 (9 Cir. 1973).

11. Although our decision here is limited to shuttle flights, since that is the sole issue before us, we do not wish to be understood

as intimating that we would decide otherwise with respect to reservation flights. When such a case arises, the Government would be well advised to make a factual presentation why the FAA extended the magnetometer-search regulations to such flights, see fn. 7, rather than continuing to rely on the "profile."

held to be wanting by the majority in *Ruiz-Estrella* was clearly present here, as the district judge found, 359 F.Supp. at 767. Whereas in *Ruiz-Estrella* the Government for tactical reasons, see 481 F.2d at 728 n. 4, did not rely on the signs, here it does.[12] To be sure, while the signs state "PASSENGERS AND BAGGAGE SUBJECT TO SEARCH," they do not say *in ipsissimis verbis* that search can be avoided by not proceeding to the designated area. But the signs and the announcement made over the loudspeakers did say that it was only "passengers" whose baggage was subject to search. Although we cannot understand why, rather than permit continued argument on this point, the Government has not taken the simple step of adding to the signs language with respect to withdrawal so plain that he who runs may read, it would outrage common sense to suppose that an intelligent woman, neither blind nor deaf nor ignorant of the language, was not aware as the district judge found "that she was as free to step out of the line of passengers (as she had been to enter that line) if she did not want her baggage to be searched," 359 F.Supp. at 767. Miss Edwards simply miscalculated the odds.

■ We thus have no occasion to consider the correctness of the district court's further finding of consent. While we do not necessarily agree with everything said on this subject in *Albarado, supra,* 495 F.2d at 806–807, the *Bell* concurring opinion does not rely on consent of the sort that would validate an otherwise unlawful search, see Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The point is rather that in order to bring itself within the test of reasonableness applicable to airport searches, the Government must give the citizen fair warning, before he enters the area of search, that he is at liberty to proceed no further.

■ The only point requiring further discussion is whether the marshal's search of the beach bag was too extensive. Our prior decisions settle that issue in favor of the Government. As Judge Mulligan wrote in *Bell, supra,* 464 F.2d at 674:

> [T]he weapon of the skyjacker is not limited to the conventional weaponry of the bank robber or the burglar. His arsenal may well include explosives. . . . [The object found] could have been gunpowder or some other explosive or deleterious substance which a hijacker might well use to cow the crew and passengers. . . . The fact that the object was not metal should not have concluded the inquiry.

See also United States v. Albarado, *supra,* 495 F.2d at 809.

Affirmed.

OAKES, Circuit Judge (concurring in the result):

I concur in affirmance but on grounds different from Judge Friendly. Judge Friendly's concurrence in United States v. Bell, 464 F.2d 667, 674 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L. Ed.2d 258 (1972), and his decision here rest upon the proposition that "the danger *alone*" of possible hijackings makes airport searches reasonable so long as they are made in good faith, with reasonable scope, and the passenger has prior notice of the search so as to be able to avoid air travel.[1] This proposition, however, while perhaps not explic-

---

12. This case is further distinguishable from *Ruiz-Estrella* in that there the search of the carry-on baggage did not take place in the course of and as a necessary incident to boarding the flight.

1. Judge Friendly says that prior notice of "fair warning" goes to "reasonableness." He does not claim that consent is implied by proceeding through the airport search when warned of its existence. In United States v. Albarado, 495 F.2d 799, 806–807 (2d Cir. 1974), this court *held* that if air travel were conditioned on submission to a search, the potential air traveler's submission would be the product of coercion and hence would not constitute implied consent. It was noted, however, that the warning of the search made the search less intrusive thereby, as compared, for instance, with a *Terry* search with its element of surprise and actual physical coercion. *Id.* at 807. Judge Friendly

itly rejected, certainly has not been adopted by *this* circuit. Rather, as suggested by Judge Mansfield in his concurrence in *Bell*, 464 F.2d at 675–676, the proposition seems inconsistent with the Supreme Court decisions on search and seizure and basic fourth amendment principles. *See* McGinley & Downs, Airport Searches and Seizures—A Reasonable Approach, 41 Fordham L.Rev. 293, 315–16 (1972). *Cf.* Note, Airport Security Searches and the Fourth Amendment, 71 Colum.L.Rev. 1039, 1049–50 (1971).

Today airports, tomorrow some other forms of search, which may be "applied to everyone" in the words of Judge Friendly's majority opinion. It is all too easy to permit encroachments upon personal liberty whenever there surfaces "a barbarism hidden behind the superficial amenities of life." *See* R. Heilbroner, An Inquiry into the Human Prospect 15 (1974). Airplane hijacking is not the only "barbarism" which may result in calls for new means of investigation and detection "applied to everyone." Whether it be a wave of political kidnappings, as are so common in South America but not yet common in this country; racial murders of random victims, which in San Francisco resulted in the stop and search of persons solely on the basis of race, *see* Bazile v. Alioto, C 74 0867 ACW (N.D.Cal. Apr. 25, 1974) (preliminarily enjoining such searches); organized civil disobedience on a grand scale, such as occurred in Washington, D. C., in 1971 resulting in the unlawful arrests of literally thousands of persons, *see* Sullivan v. Murphy, 478 F.2d 938 (D.C. Cir.) (on rehearing), cert. denied,

414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973); or the publication of classified defense information which was thought by some governmental officials to justify warrantless wiretaps or even the hiring of an extra-legal staff to burglarize a doctor's office,

> [h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an "emergency" or threat to the public. But the ultimate strength of our constitutional guarantees lies in their unhesitating application in times of crisis and tranquility alike.

United States v. Bell, 464 F.2d at 676 (Mansfield, J., concurring). *See also* Fifth Avenue Peace Parade Committee v. Gray, 480 F.2d 326, 333–335 (2d Cir. 1973) (Oakes, J., dissenting; cert. denied, 415 U.S. 948, 94 S.Ct. 1469, 39 L. Ed.2d 563 (1974).

In acknowledging that the general airport search does not seem to fall within the recognized exceptions to the warrant requirement, the majority opinion seems to me all too unconcerned with the Supreme Court command that " 'except in certain carefully defined classes of cases, a search . . . without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.' " Cady v. Dombrowski, 413 U.S. 433, 439, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973), *quoting* Camara v. Municipal Court, 387 U.S. 523, 528–529, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Whether this statement be "judicial gloss" (the Supreme Court referred to it as "one governing principle, justified by history and current experience," Camara v. Municipal Court, 387 U.S. at 528)[2] or

---

does not "necessarily agree with everything said on [consent] in *Albarado*," but that portion of the *Albarado* decision dealing with consent was not dictum, since to find the evidence unlawfully seized it was necessary to refute the claim that appellant had impliedly consented to the search.

2. The meaning of the Constitution must be considered to change or adapt to meet

changing times, with the course of history. The entire content of the concept of a Right to Privacy, while it has many fourth amendment antecedents, is basically a product of the 20th ·Century. One supposes that our fourth amendment protections may have themselves expanded to meet the threat of governmental encroachment on civil liberties exemplified by the totalitarian countries in the 1930's. *See* Jackson, J., dissenting in

the Framers' intention based on common law experience, it recognizes the proper reluctance of courts to authorize searches without probable cause found by an independent magistrate.

As to the Framers' intention, Professor Taylor's enlightening lecture, Search, Seizure and Surveillance, may stand for the majority's proposition that our constitutional fathers were more concerned about "overreaching warrants" than "warrantless searches." If so, however, this is because there is no indication that warrantless searches were, or could be, conducted of any person other than a *suspected felon* and then only incident to an arrest. T. Taylor, Two Studies in Constitutional Interpretation 28, 39 (1969). As Taylor says, "The only victims of such searches were those who, as probable felons, were the objects of hue and cry, hot pursuit, or an arrest warrant." *Id.* at 39. Indeed, Professor Taylor refers to Pollock and Maitland, who in turn speak of the fact that historically "in general the only persons whom it is safe to arrest are felons, and that a man leaves himself open to an action, or even an appeal, of false imprisonment if he takes as a felon one *who has done no felony.*" F. Pollock & F. Maitland, The History of English Law 582–83 (2d ed. 1909) (emphasis added). In other words, under the common law ordinary persons were protected from warrantless searches by an action for false arrest. It was such effective protection that overreaching constables resorted to general warrants rather than risk search without any warrant at all, hence in part the Framers' concern with "overreaching warrants" rather than "warrantless searches." Today, and for some time, however, a suit for false arrest has provided

no practical protection against a warrantless search, and the fourth amendment has required probable cause for a warrant. In the absence of the common law protection against warrantless searches and the difficulty in avoiding the probable cause requirement in obtaining warrants, the number of warrantless searches and their threat to individual liberties have increased greatly. The response of the Supreme Court has been to equate the reasonableness of a search with the presence of a warrant and to limit strictly exceptions from this rule.

Professor Taylor's contribution to the treatment of warrantless searches has been directed at recognizing the broad scope of a *search, incident to arrest, see* United States v. Edwards, 415 U.S. 800, 804 n. 6, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); United States v. Robinson, 414 U.S. 218, 233 n. 3, 94 S.Ct. 467, 38 L.Ed. 2d 427 (1973); that is, as I have said, the focus of his attention in the applicable portions of his lecture. Nor is his conclusion inconsistent with a strict interpretation of other exceptions from the warrant requirement:

> searches incident to arrest are permissible, and in exceptional cases, *if authorized by warrant* [or allowable because they fall within the recognized exceptions to the warrant requirement, e.g., "stop-and-frisk"] searches independent of arrest may be carried out.

T. Taylor, *supra,* at 49 (emphasis original) (footnote omitted).

In United States v. Albarado, 495 F. 2d 799 (2d Cir. 1974), this court engaged in a very careful weighing of the privacy invaded and the danger involved in allowing that a particular, strictly

Brinegar v. United States, 338 U.S. 160, 180–181, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of

every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.

limited and supervised airport search would be "reasonable" as a new "carefully defined" and jealously guarded exception to the warrant requirement. In so doing, this court attempted to give guidance and direction to law enforcement officials as to the permissible limits of the airport search and to make clear that cries of "danger" from those whose primary concern is "security" would be strictly scrutinized and critically examined when made to justify hitherto unknown searches. This, I feel, is the critical omission from Judge Friendly's opinion, which through its broad phraseology does not provide guidance to officials, but instead implies that those cries of "danger" will be accepted at face value and that determinations of reasonableness by those entrusted with providing security will be accorded some sort of weight. Such an approach tends to abandon the responsibility of courts to make those very determinations entrusted to them and to relegate our individual liberties to the discretion of security officials.[3]

But this does not mean that there may not be an affirmative answer in this case to the question, one left unanswered in our recent decision in United States v. Albarado, *supra*: whether a search of all carry-on luggage of air travelers absent any suspicious or other special circumstances violates the fourth amendment.

In *Albarado* the panel noted that forcing one to waive a constitutional right by submitting to a search in order to utilize air travel is a form of coercion, and therefore that any waiver so obtained would not be free and voluntary. *Id.* at 807 & n. 14. *See also* United States v. Kroll, 481 F.2d 884, 886 (8th Cir. 1973); Note, *supra*, 71 Colum.L. Rev. at 1049–50. Here, however, there was no such coercion. All baggage is not generally subject to search according to the FAA's directives; rather, only carry-on baggage is generally subject to search.[4] Thus, one is not forced to choose between flying to one's destination and having one's baggage searched. Rather one may merely consign any baggage he does not want searched to the baggage compartment. The only imposition upon the passenger then is not having the bag during the flight and, perhaps, a little wait at the destination for his luggage. Clearly this is not the same case involved when the only way to avoid search is to forego flying. The conclusion, therefore, must be that a carry-on luggage search, unlike the personal search, may be justified on a consent basis.

If, however, appellant did not know she could avoid the search by checking her bag, she would not know she could withhold her consent to a baggage search and still fly. Her consent, therefore, would not be knowing. In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Court was concerned with a somewhat analogous situation where the court of appeals had reversed a district court conviction because there was no evidence that the defendant had known he could withhold consent. In reversing the court of appeals in turn, the Court stated that voluntariness of consent "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. It added that "knowledge of the right to refuse consent is one factor to be taken into account," but it is not "the *sine qua non* of an effective consent." *Id.* Thus, in *Schneckloth* the Court found that upon all the facts there had been an adequate showing of voluntariness, even absent a showing of actual knowledge of the right to refuse consent. The Supreme Court's opinion seemed to turn on whether there was

---

3. The comments in Judge Friendly's footnote 5 of the instant opinion I do not answer here as he recognizes that note as purely dictum.

4. *See* United States v. Palazzo, 488 F.2d 942 (5th Cir. 1974); United States v. Ogden, 485 F.2d 536, 538 (9th Cir. 1973). *Compare* United States v. Cyzewski, 484 F.2d 509 (5th Cir. 1973).

any evidence of coercion either applied by the authorities or felt by the defendant. As discussed above, the FAA system, as presently practiced, does not coerce passengers into having their luggage searched. There is no evidence, moreover, that appellant here felt any coercion. Indeed, there was evidence to the contrary: the marshal asked if he could search her bag, and, according to the marshal, appellant responded affirmatively.

Beyond this, in the suppression hearing appellant, who took the stand, made no claim and gave no indication that she felt coerced either directly or indirectly. In this situation, there was no custody and no inherently coercive situation. Here appellant gave all the outward indications of consenting voluntarily. Thus I have no hesitation in concluding that appellant consented to the search of her bag. That conclusion, suggested by the district court, is that appellant gave her consent, knowing there was heroin in her bag, in the belief that it would not in any case be found.

Finding implied consent as I do, and as the district court did, it is reasonable to suppose that appellant's implied consent was limited to that search of her luggage necessary to insure that she was not carrying weapons or explosives. Were this not so, there might be some question whether the marshal here went beyond the bounds of that consent. In Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968), the Court said, "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." Thus, in the search of carry-on luggage, the right to search, even when based on consent, is not general, but one limited to the search for weapons or explosives. The marshal is not given a license to search for drugs among all airline passengers. Nevertheless, his search must be thorough, for "if we are authorizing anything, we are authorizing what is necessary to get the job done." United States v. Albarado, *supra,* at 807. The limit of the marshal's search of carry-on luggage or of containers therein ought to be what was indicated in United States v. Kroll, 481 F.2d at 886, and quoted approvingly by this court in *Albarado* at 809. A search would be permissible " 'of that which may *reasonably* be deemed to conceal a weapon or explosives. Reasonableness, in this context, is a matter of probabilities.' "

In the case before us the marshal upon opening appellant's beach bag found two pairs of slacks, one of which was wrapped around a package. The marshal asked what it was, and appellant replied it was a box of Tampax. This answer was apparently inconsistent with the feel of the package. Moreover, the package was apparently wrapped in the slacks so as to conceal it. The size of the package, in any case, which contained 1,664 glassine envelopes of heroin, was sufficient at least to conceal explosives, if not a small pistol. In these circumstances it was reasonable for the marshal to remove the slacks and look within the exposed brown paper bag, thereby discovering the heroin.

I concur in the judgment affirming the conviction.