JORGE SANTIAGO, JR. *v.* STATE OF MARYLAND

[No. 92, September Term, 1981.]

*Decided October 9, 1981.*

The cause was submitted on briefs to MASON, WILNER and COUCH, JJ.

Submitted by *Donald Daneman* and *William B. Purpura* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Michael A. Anselmi, Assistant Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *William R. Roessler, Assistant State's Attorney for Anne Arundel County,* for appellee.

WILNER, J., delivered the opinion of the Court.

Appellant was convicted in the Circuit Court for Anne Arundel County of possession of cocaine, for which he was fined $2,500 and placed on five years probation. His sole complaint in this appeal is that the cocaine in question and certain other incriminating items were discovered and seized unlawfully and should have been suppressed as evidence.

The search and seizure occurred at Baltimore-Washington International Airport. At about 8:30 a.m. on May 19, 1980, appellant attempted to pass through the security screening unit at Pier C, leading to the aircraft boarding areas. In accordance with standard and familiar procedures, he surrendered a piece of hand luggage for x-ray inspection. As the luggage passed through the machine on the conveyor belt, the security officer operating the machine — one Warren Jordan — observed in the x-ray scope a dark object that he was unable to identify. He immediately requested his assistant, Roberta Florey, to inspect the bag.

Mrs. Florey also saw the bag under the "scope," and she too noticed large, dark, unidentifiable objects. When the bag emerged from the machine, she put it on the table, where appellant identified it as his.

Mrs. Florey told appellant that she would have to look in the bag, to which he replied "okay" and proceeded to unlock it. She then opened the bag and began to search through it, in the course of which she discovered a box. Without objection from appellant, she opened the box and saw a large sum

of money.[1] She did not recall seeing anything else in the box. Becoming "suspicious," she handed the box to Maryland State Trooper Vernon Sarro, who, as part of the airport security team, was standing nearby. There is no indication in the record that appellant objected to this transfer.

Sarro had observed the search conducted by Mrs. Florey. He looked into the open box and saw not only the money but three other objects as well — a clear see-through "baggie" containing a white powdery substance, an opaque film cannister, and a dark brown bottle containing a powdery substance. Sarro, who had had some police training in the identification of controlled dangerous substances, who had been on the State police force for nine years, and who, as a resident trooper in Carroll County, gave "talks" on controlled dangerous substances, immediately concluded (correctly, as it turned out) that there was indeed contraband in the box, whereupon he detained and ultimately arrested appellant.

Appellant does not contest the reasonableness of the x-ray examination of the luggage, or the cursory search made by Mrs. Florey. What he complains about is the handing over of the box to Trooper Sarro and the search and seizure made by him. We find no error.

Whatever may have been the case before "skyjacking" became popular either as gainful employment or as a form of political protest, airport searches such as that conducted here are, by now, generally regarded as permissible under the Fourth Amendment.

The use of airport searches as part of a program to eliminate air piracy began in 1968. From a statistical study of the behavioral characteristics of known hijackers, a "profile" of the potential hijacker was developed. A selective screening process, based upon that "profile," was then instituted. That early process, as described in Ingram, *Are Airport Searches Still Reasonable?* 44 J. Air Law & Com. 131, 134 (1978), was essentially as follows:

---

1. At trial, it was established that the box contained $28,500.

"[A]irline employees, such as ticket agents, applied the profile to passengers entering the airport. Those passengers fitting the profile were designated 'selectees' by the employees, and this information was forwarded to airline personnel at the boarding gate, usually by distinctive markings upon the selectee's ticket or boarding pass. Upon the selectee's arrival at the boarding gate, he was required to pass through a metal detector with his carry-on baggage. If the metal detector indicated the selectee was carrying an amount of metal equal to the mass of a small handgun, the airline employee on duty at the gate stopped him and requested identification. If satisfactory identification was not presented, a United States Marshal was summoned, and identification was requested again. If the selectee still refused or was unable to present satisfactory identification, he was requested to pass through the metal detector a second time. A second indication of metal on the person or in the baggage of the selectee provoked a request for submission to a voluntary 'pat-down frisk.' The selectee's carry-on baggage was also searched. If at any point in this procedure the selectee passed a particular test, further investigation was foregone and he was allowed to board the airplane." (Footnotes omitted.)

*See also United States v. Davis,* 482 F.2d 893 (9th Cir. 1973).

By September, 1971, the FAA concluded that the selective screening program had not proved adequate. New regulations were therefore adopted in February, 1972, requiring that the air carriers screen *all* passengers on reservation flights. The screening process itself, however, was somewhat flexible. Though not spelled out in the regulation (*see* 41 C.F.R. § 121.538 (1973)), the FAA permitted the screening to be accomplished "by one or more of the following systems: behavioral profile, magnetometer, identification check, physical search." *See* 3 LaFave, *Search and Seizure* 330

(1978) quoting FAA Press Release No. 72-76 (February 6, 1972). That too proved insufficient; hijackings continued such that by January 5, 1973, *all* passengers on *all* flights in the United States were required to undergo metal detector screening and inspection of carry-on baggage before being allowed to board the airplane.[2]

Predictably, the courts were soon called upon to consider the constitutionality of these increasingly pervasive intrusions. Almost without exception, they have determined that passenger searches and searches of luggage sought to be taken aboard commercial aircraft are "reasonable" (and thus permissible) if conducted in accordance with the rules and procedures adopted or required by the Federal Aviation Administration. *See, for example, United States v. Edwards,* 498 F.2d 496 (2d Cir. 1974); *United States v. Skipwith,* 482 F.2d 1272 (5th Cir. 1973); *State v. White,* 549 P.2d 600 (Ariz.App. 1976); *People v. Hyde,* 524 P.2d 830 (Cal. 1974); *People v. Dooley,* 134 Cal.Rptr. 573 (Cal.App. 1976), all involving luggage searches; *and see United States v. Bell,* 464 F.2d 667 (2d Cir.), *cert. den.* 409 U.S. 991 (1972); *United States v. Epperson,* 454 F.2d 769 (4th Cir.), *cert. den.* 406 U.S. 947 (1972), involving personal searches. *But see People v. Sortino,* 325 N.Y.S.2d 472 (Sup.Ct. 1971) (search held unconstitutional in absence of probable cause).

Although in agreement as to the end result — the validity of searches conducted in accordance with FAA regulations — the courts have been unable to reach a consensus on a proper rationale for such searches, other than the pragmatic need for them. *See generally,* Weinstock, *The Airport Search and the Fourth Amendment: Reconciling the Theories and Practices,* 7 UCLA-Alaska L. Rev. 307 (1978).

The United States Courts of Appeal for the Second and the

---

2. Current FAA regulations require the airlines to adopt and put into use a screening system "designed to prevent or deter the carriage aboard its aircraft of any explosive or incendiary device or weapon in carry-on baggage or on or about the persons of passengers. . . ." 14 C.F.R. § 121.538(B) (1980). Moreover, the airlines must "refuse to transport . . . (2) any property of any person who does not consent to a search or inspection of that property in accordance with the screening system prescribed by paragraph (B) of this section." 14 C.F.R. § 121.538(K) (1980).

Seventh Circuits initially upheld warrantless airport searches on the basis that activation of hijacker detection devices produces sufficient articulable suspicion to justify a weapons search under the standards established in *Terry v. Ohio,* 392 U.S. 1 (1968). *See United States v. Bell, supra,* 464 F.2d 667; *United States v. Fern,* 484 F.2d 666 (7th Cir. 1973). That type of analogy did not find favor among the other circuits, however, and, with the advent of the newer FAA regulations requiring the indiscriminate screening of *all* passengers and *all* carry-on luggage, even the Second Circuit has discarded it in favor of a more general reasonableness standard. *See United States v. Edwards, supra,* 498 F.2d 496.[3]

In contrast, the Ninth Circuit and State courts in California and Arizona have upheld the screening of airline passengers and their carry-on luggage on the ground that they are akin to the administrative searches upheld in *Camara v. Municipal Court,* 387 U.S. 523 (1967).[4] The Fifth Circuit has given airport searches the green light by analogizing them to "border" searches, treating the aircraft boarding area as a type of "critical zone," justifying a search upon "mere suspicion." *See United States v. Moreno,* 475 F.2d 44 (5th Cir.), *cert. den.* 414 U.S. 840 (1973), and *United States v. Skipwith supra,* 482 F.2d 1272.

---

**3.** As the Court in *United States v. Davis, supra,* 482 F.2d at 906, explained: "In *Terry*. . . the Court went to great pains to make clear that the officer's right to conduct such a search of an individual depends upon the officer's possession of specific, articulable facts sufficient to satisfy a reasonably prudent person that the particular individual is in fact armed and dangerous." Obviously, this requirement cannot be satisfied when searches are conducted indiscriminately. *See also* Weinstock, *supra,* 7 UCLA-Alaska L. Rev. at 319-20.

**4.** *See United States v. Davis, supra,* 482 F.2d at 908:

"[S]earches conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime, may be permissible under the Fourth Amendment though not supported by a showing of probable cause directed to a particular place or person to be searched.

"As we have seen, screening searches of airline passengers are conducted as part of a general regulatory scheme in furtherance of an administrative purpose, namely, to prevent the carrying of weapons or explosives aboard aircraft, and thereby to prevent

Regardless of the approach taken, the courts which have ruled on the matter have, in the end, engaged in a balancing of governmental versus individual interests; and through that balancing process, nearly all have reached the conclusion that in light of the potential consequences of aircraft hijacking, the intrusion into protected rights by a search reasonable in scope is more than counterweighed by the government's legitimate interest in preventing such harm. *See United States v. Davis, supra,* 482 F.2d at 910 (administrative search theory); *United States v. Edwards, supra,* 498 F.2d at 500 (general reasonableness theory); *United States v. Skipwith, supra,* 482 F.2d at 1275 (border search analogy); *United States v. Bell, supra,* 464 F.2d at 673-74 (*Terry* rationale). As stated by Judge Friendly concurring in *Bell* at 675, and subsequently for the Court in *Edwards, supra,* 498 F.2d at 500:

> "When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, *so long as the search is conducted in good faith for the purpose of preventing hijacking or like damage and with reasonable scope and the passenger has been given advance notice of his liability to such a search so that he can avoid it by choosing not to travel by air.*" (Emphasis supplied.)

Appellant, as we have said, does not contest the electronic intrusion or even the manual search by Mrs. Florey, but only the ultimate search (and seizure) by Trooper Sarro. The rationale underlying the initial intrusion is equally relevant to the search conducted by Trooper Sarro, however. As pointed out in *United States v. Bell, supra,* 464 F.2d at 674,

---

hijackings. The essential purpose of the scheme is not to detect weapons or explosives or to apprehend those who carry them, but to deter persons carrying such material from seeking to board at all."

*See also State v. White, supra,* 549 P.2d 600; *People v. Hyde, supra,* 524 P.2d 830.

the object of these searches is not just the "conventional weaponry of the bank robber or of the burglar." A skyjacker's arsenal may just as well include gunpowder or other explosive substances, perhaps in relatively small quantities concealed in innocuous-looking containers. *See also United States v. Moreno, supra,* 475 F.2d at 49: "[M]odern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube."

Since the detection of these deadly, but easily concealable, substances is the very rationale for the search to begin with — that which makes even the initial intrusion reasonable — it necessarily follows that the search may properly continue into packages and containers, such as the box in question, which cannot otherwise be clearly identified as harmless.[5] Although Mrs. Florey said that she did not see anything in the box but the money, she did not say (or imply) that the box was otherwise empty. She handed it to Trooper Sarro for further inspection because she was suspicious. She was not, in other words, satisfied that the box was harmless; and that lingering doubt or suspicion, in our view, sufficed to justify some additional investigation by Sarro. *See People v. Hyde, supra,* 524 P.2d 830 (upholding search of carry-on luggage and shaving kit contained therein); *People v. Bleile,* 118 Cal.Rptr. 556 (Cal.App. 1975) (inspection of carry-on luggage and laundry bag contained therein held reasonable); *and cf. United States v. Cyzewski,* 484 F.2d 509 (5th Cir. 1973), *cert. dismissed* 415 U.S. 902 (1974) (inspection of *checked* luggage and laundry bag within held reasonable).

Having decided that the search in question was reasonable within the meaning of the Fourth Amendment, it is unnecessary for us to consider the additional questions of (1) whether, based on the evidence in this record, appellant

---

5. The danger presented by explosive devices being carried aboard aircraft is, of course, apparent; and, as we have noted, it is that danger which has been held to justify the otherwise impermissible intrusion into the personal effects of passengers. *Quaere:* could the ingestion of controlled dangerous substances, such as hallucinogens, aboard an aircraft in flight also present such a danger to the public safety as to justify their detection and exclusion upon the same rationale? That is a question we need not decide in this case.

waived any objection to the search by manifesting an actual consent to it; (2) whether, given the widespread knowledge of airport security measures, the clear posted warnings of such, and the avoidability of the intrusion by simply not proceeding beyond the checkpoint, appellant impliedly consented to the search; [6] (3) whether, given the same factors, persons attempting to pass through security checkpoints can have any reasonable expectation of privacy in regard to the contents of their carry-on luggage; [7] or (4) whether, in light of Sarro's testimony that the contraband was in plain view when he first looked into the already open box, the "search" is sustainable under the "plain view" doctrine.

We find no error in the admission of the contested evidence.[8]

> *Judgment affirmed; appellant to pay the costs.*

---

**6.** The courts are split on the question of whether the implied consent rationale is a proper basis for upholding the validity of airport searches. *Compare United States v. Freeland,* 562 F.2d 383 (6th Cir.), *cert. den.* 434 U.S. 957 (1977); *United States v. Williams,* 516 F.2d 11, 12 (2d Cir. 1975) (per curiam); *United States v. Doran,* 482 F.2d 929, 932 (9th Cir. 1973) (accepting implied consent rationale) with *United States v. Albarado,* 495 F.2d 799, 806-07 (2d Cir. 1974); *United States v. Kroll,* 481 F.2d 884, 886 (8th Cir. 1973) (rejecting implied consent rationale).

**7.** The notion that the pervasive knowledge of airport security measures, not to mention the ubiquitous signs warning of such, reduces any expectation of privacy concerning the contents of carry-on luggage has not been well accepted, at least in the earlier cases. *See United States v. Davis, supra,* 482 F.2d at 905; *People v. Hyde, supra,* 524 P.2d at 833, n. 4. *See also* Weinstock, *supra,* 7 UCLA-Alaska L. Rev. at 333. Whether that view would prevail today, when the "universal" search, as opposed to selective searches of "profile" candidates, has become so commonplace and expected, is not altogether clear.

**8.** As a final fitting note, we quote this passage from *United States v. Skipwith, supra,* 482 F.2d at 1278:

"Although the discovery of cocaine in a search for weapons may be unexpected by the government, there is nothing in the Constitution that gives the apprehended felon a right to complain because the product of the protective action was not anticipated. Such a result cannot properly be classified as a windfall. It is the product of valid police work. The government has no duty to catch a carrier of dope sportingly or according to any game book rule. Nor is it material whether the circumstances leading to the discovery of the cocaine were of the defendant's making; all that matters is that the search be legally conducted."