# UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

No. 97-30593

LARRY AUBREY,

Plaintiff-Appellant,

versus

SCHOOL BOARD OF LAFAYETTE PARISH, ET AL.,

Defendants,

SCHOOL BOARD OF LAFAYETTE PARISH,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Louisiana

August 10, 1998

Before POLITZ, Chief Judge, REYNALDO G. GARZA and DENNIS, Circuit Judges.

POLITZ, Chief Judge:

Larry Aubrey, a custodian employed by the Lafayette Parish School Board in an elementary school, seeks injunctive relief and damages because he was subjected to a urinalysis which he contends violated his fourth amendment rights[1]

---

[1] Aubrey contends that his due process rights were violated because the Board did not permit him to take an alternative test. He never challenged the

and provisions of the Louisiana Drug Testing Act.[2] He appeals an adverse summary judgment. For the reasons assigned, we affirm.

## BACKGROUND

As a custodian at the Prairie Elementary School, Aubrey's duties included cleaning the fourth and fifth grade bathrooms each day, using various chemicals.[3] He mowed the grounds immediately adjacent to the building and was responsible for securing the premises at the end of the day, making minor repairs to buildings, furniture and equipment, lighting pilot lights, maintaining HVAC equipment, cleaning and replacing light fixtures, and trimming trees. He constantly was in the presence of the young students.

In December 1992, the Board adopted an Employee Drug Testing Policy.[4]

---

validity of the first test, however, and the record reflects that he refused a retest of the same sample.

[2]La. R.S. 49:1001, *et seq.* (West Supp. 1997).

[3]The chemicals used by custodians in cleaning bathrooms included phosphoric acid, butyl carbitol, alkyldime thuybenzylam monium chloride, didecyl dimethyl and alkyldimethyl/benzyl ammonoum chloride, octyl dimethyl amine oxide, hydrochloric acid and quaternary ammonium chloride.

[4]The first clause of the policy's statement of purpose provides: "The children of Louisiana are the greatest natural resource this state provides and their continued safety and health is of serious importance to state and local education agencies. Therefore, the Lafayette Parish School Board has a compelling interest and commitment to eliminate illegal and unauthorized drug use (including the

In August 1993, Aubrey attended an in-service training for the custodial staff in which the drug testing policy was distributed and reviewed.

Each year the Board submitted a list of "safety sensitive" employees to Security Concepts International, Inc. for random selection and drug testing. On September 28, 1994, the Board requested that Aubrey and fourteen other employees submit to a urinalysis screening. Aubrey's test indicated the presence of tetrahydrocannabinol, the active chemical in marihuana. As an alternative to termination, the Board required that Aubrey attend a substance abuse program at the Freedom Recovery Center, Inc. Denying that he had used marihuana, Aubrey sought an injunction barring the Board from firing him, or requiring that he continue to attend the substance abuse program. The district court granted the injunction to the extent that Aubrey was permitted to submit to periodic drug testing and individual as opposed to group therapy treatment.

Thereafter, the district court granted the Board's motion for summary judgment, dismissing the action in its entirety. Aubrey appealed and we reversed and remanded, concluding that the record did not contain sufficient summary judgment evidence upon which to balance the government's need to protect

unauthorized use of alcohol), drug users, drug activities, and drug effects from all of its workplaces."

3

children against the intrusion of Aubrey's fourth amendment rights.[5] We noted a need for additional evidence, including how particular positions were selected and designated as "safety sensitive," the notice given to employees in such positions, and whether the plaintiff's own position fell within the safety sensitive category.[6]

The Board resubmitted its motion for summary judgment and filed additional evidence addressing our concerns. The district court once again granted the defendant's motion for summary judgment. Aubrey timely appealed.

## ANALYSIS

We review a grant of summary judgment *de novo*, applying the same standard used by the district court and, in reviewing the facts, we draw all inferences in favor of the nonmoving party.[7] We do not weigh the evidence, assess its probative value, or resolve any factual disputes; rather, we search the record for resolution-determinative facts.[8] Summary judgment is only appropriate when there

---

[5]Aubrey's notice of appeal indicated he was appealing the dismissal of both the Board and the Center. In his brief, however, he states that he appealed only the grant of summary judgment to the Board. Therefore, the Center's dismissal is not before us. Fed. R. Civ. P. 28. *See* **Zeno v. Great Atlantic & Pacific Tea Co.**, 803 F.2d 178 (5th Cir. 1986).

[6]**Aubrey v. School Board of Lafayette Parish**, 92 F.3d 316 (5th Cir. 1996).

[7]**Elliot v. Lynn**, 38 F.3d 188 (5th Cir. 1994).

[8]**FDIC v. Myers**, 955 F.2d 348 (5th Cir. 1992).

is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[9]

The fourth amendment guarantees the privacy, dignity and security of persons against certain arbitrary and invasive acts by officers of the government or those acting at their direction.[10] By virtue of the fourteenth amendment, the fourth amendment governs searches by state as well as federal government officials.[11] Further, the fourth amendment is not limited to searches conducted for law enforcement purposes but extends to all government searches, including those conducted by the government while acting as an employer.[12] This restraint on government conduct generally bars officials from undertaking a search or seizure absent individualized suspicion. Searches conducted without grounds for suspicion of particular individuals have been upheld, however, in certain limited circumstances.[13]

---

[9]Fed. R. Civ. P. 56 (c); **Celotex Corp. v. Catrett**, 477 U.S. 317 (1986).

[10]**Camara v. Municipal Court of San Francisco**, 387 U.S. 523 (1967); **Skinner v. Railway Labor Executives Association,** 489 U.S. 602 (1989).

[11]**New Jersey v. T.L.O.**, 469 U.S. 325 (1985); **Elkins v. United States**, 364 U.S. 206 (1960).

[12]**O'Connor v. Ortega**, 480 U.S. 709 (1987).

[13]*See* **National Treasury Employees v. Von Raab**, 489 U.S. 656 (1989); **Skinner v. Railway Labor Executives Association,** 489 U.S. 602 (1989);

A program which compels government employees to submit to urinalysis is a search within the meaning of the fourth amendment because such tests invade reasonable expectations of privacy.[14] Such a drug test therefore must meet the reasonableness requirement. The amendment does not proscribe all searches and seizures, but reasonableness depends on the nature of the search and seizure.[15] In a situation in which the fourth amendment intrusion serves a special government need beyond that of law enforcement, a balancing test is required.[16] The interest of the government must be weighed against the privacy interest of the employee. The analysis of the privacy interest should include not only the desire to be free from mandatory testing, but also the intrusiveness of the particular program at issue.[17]

The Supreme Court has found that special needs may outweigh the privacy interests of individuals. In *Skinner v. Railway Labor Executives Association*,[18] the

---

**Vernonia School District 47J v. Acton**, 515 U.S. 646 (1995); **Chandler v. Miller**, 117 S.Ct. 1295 (1997).

[14]**Von Raab**, 489 U.S. at 665-666; **Skinner**, 489 U.S. at 616-618.

[15]**United States v. Montoya de Hernandez**, 473 U.S. 531 (1985).

[16]**Skinner**, 489 U.S. at 619.

[17]**Acton**, 515 U.S. at 652-654; **Skinner**, 489 U.S. at 619.

[18]489 U.S. 602 (1989).

Court stated:

> The Government's interest in regulating the conduct of railroad employees to ensure safety, like its supervision of probationers or regulated industries, or its operation of a government office, school, or prison, "likewise presents 'special needs' beyond normal law enforcement that may justify the departures from the usual warrant and probable-cause requirements."[19]

Similarly in *National Treasury Employees v. Von Raab*, the Court found permissible the U.S. Customs Service's drug testing program analyzing urine specimens of employees applying for promotions to positions involving interdiction of illegal drugs and requiring the carrying of firearms.[20]

In *Vernonia School District 47J v. Acton*,[21] a policy adopted by a school district to test student athletes was held non-violative of fourth amendment protections. The Court stated that "[d]eterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs, which was the governmental concern in *Von Raab* or deterring drug use in engineers and trainmen, which was

---

[19] **Skinner**, 489 U.S. at 620 (*quoting* **Griffin v. Wisconsin**, 483 U.S. 868, 873-874 (1987)).

[20] **National Treasury Employees Union v. Von Raab**, 489 U.S. 656 (1989).

[21] 515 U.S. 646 (1995).

7

the governmental concern in *Skinner*."[22]

In *Chandler v. Miller*,[23] the Supreme Court's most recent fourth amendment drug testing case, the Court found violative of the fourth amendment a Georgia statute requiring candidates for state offices to certify that they had tested negative in a drug urinalysis. Georgia failed to show a special need substantial enough to override the candidates' privacy interests.

*Skinner*, *Von Raab*, *Acton* and *Chandler* provide guidance with respect to whether a particular search meets the reasonableness standard, to be determined by balancing the testing program's intrusion on the individual's fourth amendment protections against its promotion of legitimate governmental interests.[24]

We first turn to the interests articulated by the Board. The Board contends that the urinalysis was obtained to maintain the safe and efficient operation of its schools, ensure the physical safety of the children of Lafayette Parish, and decrease the potential spread of drug use among its students. In pursuit of its objectives, the Board created a list of employees who were considered safety sensitive, including

---

[22]**Acton**, 515 U.S. at 661 (citations omitted).

[23]117 S.Ct. 1295 (1997).

[24]**Acton**, 515 U.S. at 652-653; **Von Raab**, 489 U.S. at 665-666; **Skinner**, 489 U.S. at 619; **Chandler**, 117 S.Ct. at 1301;

custodial employees such as Aubrey. Aubrey's duties, outlined above, obviously are important to the efficient operation of the school. The tasks assigned to him are important. Despite Aubrey's efforts to minimize the importance of his duties, we are persuaded that the failure of the Board to use significant caution in the selection and supervision of personnel performing such duties in a school that serves nearly 900 students, ranging in age from three to eleven, could place the children at significant risk.

The Board also asserts that it "has a compelling interest and commitment to eliminate illegal and unauthorized drug use (including the unauthorized use of alcohol), drug users, drug activities, and drug effects from all of its workplaces." The Board has not produced any summary judgment evidence to demonstrate a problem of drug abuse or use in its schools, and although such a showing would be of persuasive value, it is not mandatory[25] and such a requirement would present "an unduly narrow view of the context in which the [Board's] testing program was implemented."[26] As in *Von Raab*, "[p]etitioners do not dispute, nor can there be doubt, that drug abuse is one of the most

---

[25]**Chandler**, 117 S.Ct. at 1303 ("A demonstrated problem of drug abuse, while not in all cases necessary to the validity of a drug testing regime, *see Von Raab*, 489 U.S. at 673-675, would shore up an assertion of special need for a suspicionless general search program.").

[26]**Von Raab**, 489 U.S. at 673-674.

9

serious problems confronting our society today."[27]  Unfortunately, neither our workplaces nor our elementary schools are immune from the drug scourge causing such problems in our land.  The Board's program is designed to prevent drug users from obtaining a safety sensitive position and to aid in detecting those employees in such positions who use drugs so that they may undergo treatment as a prerequisite to keeping their jobs.  We find the Board's interests to be substantial indeed.

The Board's valid and compelling public interests must be weighed against the intrusion and interference with individual liberty that results from requiring the designated safety sensitive employees to undergo a urine test.[28]  An employee's expectation of privacy must be assessed in the context of the employment relation.[29] "[O]perational realities of the workplace may render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts."[30]  First, Aubrey had notice that his position as a custodian was specifically designated as safety sensitive and that he would be subjected to random

---

[27]**Id.** at 674.

[28]**Id.** at 671.

[29]**O'Connor v. Ortega**, 480 U.S. 709 (1987); **Pierce v. Smith**, 117 F.3d 866 (5th Cir. 1997).

[30]**Von Raab**, 489 U.S. at 671 (citation and internal quotation omitted).

10

testing after he attended the in-service training program. The custodial position was considered safety sensitive because of the handling of potentially dangerous machinery and hazardous substances in an environment including a large number of children ranging in age from three to eleven. Aubrey and other custodial employees "reasonably should expect effective inquiry into their fitness and probity"[31] to operate and use such material in a school setting. The position has a possible impact on the physical safety of the students in their educational environment and the presence of someone using illegal drugs increases the likelihood that children will have an open avenue to obtain the drugs.[32]

Second, the intrusiveness of the search was minimal. There is no evidence that anyone observed, listened or otherwise monitored the collection of the urine sample. Aubrey produced the sample in privacy. In addition, he was not required to disclose any personal medical information, nor was the urinalysis used to determine the presence of anything other than the presence or absence of drugs.[33] Finally, despite

---

[31]**Id.** at 672.

[32]*See* **Hansen v. California Dep't. of Corrections**, 920 F. Supp. 1480, 1492 (N.D. Cal. 1996)("[P]rison guards who use drugs may be more likely to smuggle drugs to prisoners, as they need money to support their habit, as they may be subject to blackmail if prisoners know of their drug use, and as their drug use may mean that they are less reluctant to violate the law by providing others with drugs.").

[33]*See* **Von Raab**, 489 U.S. at 672, **Acton**, 515 U.S. at 658-659.

testing positive to marihuana, the Board did not dismiss Aubrey but, rather, required that he submit to a substance abuse program.

It is clear that unlike *Chandler*, the special need in this case is substantially more than symbolic or a desire to project a public image. In a recent case we addressed the importance of the government's demonstration of a special need. In *Orleans Parish School Board*,[34] we held that the School Boards' policies, requiring all employees to submit to a drug abuse and alcohol screening panel following an accident during the course and scope of their employment, were violative of the fourth amendment. The Boards failed to articulate a special need for the testing, relying solely on a general interest. The Lafayette Parish School Board has demonstrated that it is motivated by the special incentive to protect our most important resource--children. Although the facts in this case differ from *Acton* in that the school was testing student athletes as opposed to employees, the most significant element in both this case and *Acton* is that "the Policy was undertaken in furtherance of the government's responsibilities, under a public school system, as guardian and tutor of children entrusted to its care."[35] The school system's role as a guardian does not end with protecting children from their own

---

[34]**United Teachers of New Orleans v. Orleans Parish School Board**, 1998 WL 276237 (5th Cir. 1998).

[35]**Acton,** 515 U.S. at 665.

12

actions, but must deter potentially dangerous actions of adults, including school employees, who may have interaction with and influence upon them.  We therefore conclude and hold that the Board's need to conduct the suspicionless searches pursuant to the drug testing policy outweighs the privacy interests of the employees in an elementary school who interact regularly with students, use hazaradous substances, operate potentially dangerous equipment, or otherwise pose any threat or danger to the students.

Aubrey also contends that the drug testing procedure established by the Board is deficient.  He insists that the Board violated sections 1006(D)(7)[36] and 1008(C)[37] of

---

[36]La. R.S. 49:1006(D)(7) (West Supp. 1997).

> D)     The employer may, but is not required to, direct each collection site person to collect split samples.  If split samples are collected, they shall be collected in according to the following:
>
> *   *   *
>
> 7)     If the test of the first bottle is confirmed positive, a split sample collected, the employee may request that the medical review officer direct that the second bottle be tested, at the employee's own expense, in an NIDA-certified or CAP-FUDT-certified laboratory for presence

of the drug(s) for which a positive result was obtained in the test of the first bottle.

> *   *   *

[37]La. R.S. 49: 1008(C) states:

> Screening laboratories shall collect split samples in strict accordance with the

the Louisiana Drug Testing Act because the screening laboratory failed to collect split samples.[38]  Both sections apply, however, only to "screening laboratories"; meaning a facility which performs drug testing "and which is not NIDA-certified[39] or CAP-FUDT[40] certified for forensic urine drug testing. . . ."[41]  The laboratory which performed the testing of the subject sample, Laboratory Specialists, Inc., is not considered a screening laboratory and is CAP-FUDT certified.  Further, under section 1006, an employer "may, but is not required to, direct each collection site person to collect split samples."  Aubrey's assertions thus are meritless.

The judgment appealed is AFFIRMED.

ENDRECORD

---

provisions of this Chapter.  Following collection of split samples, the first sample shall be sealed, labeled, and stored in strict accordance with NIDA guidelines.  The second sample shall be analyzed...in accordance with NIDA guidelines.

[38]A split sample is defined as a "urine specimen from one individual that is separated into two specimen containers." La. Rev. Stat. § 49:1001 (21)(West Supp. 1997).

[39]National Institute on Drug Abuse.

[40]College of American Pathologists-forensic urine drug testing.

[41]La. R.S. 49:1001(20)(West Supp. 1997).

DENNIS, Circuit Judge, dissenting.

I disagree with the majority's conclusion that the school board has shown that this case falls within the closely guarded "special needs" category recently recognized by the Supreme Court within which state officials without reasonable individualized suspicion of wrongdoing may require a person to submit to an urinalysis drug test. In this case the school board, without reasonable individualized suspicion that a janitor's urine contained evidence of illegal drug usage, randomly selected and ordered him to submit to a urinalysis drug test, on pain of disciplinary action which could result in termination. The janitor was subjected to urinalysis under the school board's random drug-testing program, which appears to cover mandatorily all manual labor school board employees, while notably omitting any such requirement of teachers, principals, and administrative and clerical personnel.

The school board compelled drug test effected a search within the meaning of the Fourth and Fourteenth Amendments. The decisions of the Supreme Court clearly require that state officials have an individualized reasonable suspicion that illegal drug use evidence is contained in a person's urine before ordering him to submit to an urinalysis drug test. The majority's erroneous conclusion that the state's proffered "special need" for drug testing justified the suppression of the Fourth Amendment's normal requirement of individualized suspicion led to its mistaken affirmance of the

15

district court's summary judgment rejecting the janitor's petition for injunctive relief and damages. The majority's decision also conflicts in principle with a previous decision of this court. Accordingly, I respectfully dissent.

That the school board's actions invaded an expectation of privacy that society is prepared to recognize as reasonable is not disputed. "'There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.'" *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (quoting *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987)). "Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment." *Id.* (footnote omitted).

The decisions of the Supreme Court require that state officials have an individualized reasonable suspicion that a person's urine contains evidence of illegal drug use before ordering him to submit to an urinalysis drug test. The Supreme Court, in *Skinner v. Railway Labor Executives Association*, 489 U.S. 602 (1989), and

16

*National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), recognized a "special needs" category of cases involving train operators and Customs Service agents and permitted suspicionless government mandated urinalysis of such persons under the particular and unique circumstances and regulated drug testing programs in those cases. Previously, Supreme Court Justices, in dicta and separate opinions, had spoken of "special needs" in contexts other than urinalysis drug testing but clearly had not designated a "special needs" category for suspicionless searches or seizures. Subsequent to *Skinner* and *Von Raab* the Supreme Court, in *Vernonia School District 47J v. Acton,* 515 U.S. 646 (1995), recognized a "special needs" category for suspicionless random sample urinalysis of secondary school athletes, who, as a condition of eligibility for interscholastic athletics, had signed forms consenting to the test and had obtained written consent from their parents, under the particular, unique circumstances involving an "immediate crisis" caused by a sharp increase in drug use by students.

Recently, in *Chandler v. Miller*, 520 U.S.---, 117 S.Ct. 1295 (1997), the Supreme Court held that a state's statutory requirement that candidates for state office submit to an urinalysis drug test does not fit within the closely guarded "special needs" category of constitutionally permissible suspicionless searches established by *Skinner*, *Von Raab*, and *Vernonia* and that those precedents remain the guides for determining

17

whether any proffered "special needs" for suspicionless drug testing passes constitutional muster. In the present case, it is clear that the school board's requirement that an adult janitorial worker submit to urinalysis drug testing, which was not based on reasonable individualized suspicion, did not fit within the closely guarded "special needs" category of constitutionally permissible suspicionless searches, because the random drug test order was not supported by a showing of any of the factors necessary to justify a "special needs" category and suspicionless drug testing policy or program.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Until the late 1960's, the steadfast rule was that in order for a search to be "reasonable," law enforcement officials must first obtain a warrant from a neutral and detached magistrate by establishing probable cause that a law had been violated, and that in the few specific situations in which obtaining a warrant was deemed impracticable probable cause was still required. *See, e.g., Carroll v. United States*,

18

267 U.S. 132 (1925); *Agnello v. United States*, 269 U.S. 20 (1925). As the Supreme Court considered nontraditional applications of the Fourth Amendment, however, such as searches by public inspections officials, *see Camara v. Municipal Court*, 387 U.S. 523 (1967), and frisks by police officers, *see Terry v. Ohio*, 392 U.S. 1 (1968), it found it needed more flexibility than the warrant and probable cause requirements could provide. The Court began, in limited circumstances, to recognize specific permissible departures from the traditional probable cause requirement, after "balancing the need to search against the invasion which the search entails". *Camara*, 387 U.S. at 537; *accord Terry*, 392 U.S. at 21. "Those departures have been of two different kinds: (1) [those] requiring only lesser individualized suspicion, [and] (2) [those] requiring no individualized suspicion but only a random or other nonarbitrary selection process[.]" Wayne R. LaFave, *Computers, Urinals, and the Fourth Amendment: Confessions of a Patron Saint*, 94 MICH. L. REV. 2553, 2575-1576 (1996)[hereinafter LaFave]; *cf. Terry*, 392 U.S. 1; *Camara*, 387 U.S. 523.

Each situation in which the Supreme Court has created an exception that allows an intrusion without reasonable individualized suspicion is markedly different from the school board mandated urinalysis test situation in the present case. In comparison, each of those cases is clearly distinguishable from the present case on one or more of the following grounds: (1) the nature of the intrusion was much less severe; (2) the

magnitude of the governmental need for the search was far greater; and/or (3) it was impracticable or impossible to respond to the governmental need with the individualized suspicion requirement. *See* LaFave, *supra*, at 2577 (citing and referencing cases).

For example, the premises inspection cases do not involve a serious intrusion upon personal privacy because even the housing inspections, and especially the business inspections, are not "personal in nature." *Camara*, 387 U.S. at 537. "The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas and electrical systems, and toward the accumulation of garbage and debris, and there is no rummaging through private papers and effects of the householder." LaFave, *supra*, at 2577-78. The search at issue in the present case, by contrast, is extremely personal in nature because it intrudes upon "an excretory function traditionally shielded by great privacy." *Skinner*, 489 U.S. at 626; *see also* LaFave, *supra*, at 2577-78 (discussing similar type of search in *Acton*).

The present case is distinguishable from the "special needs" urinalysis cases, and from other Fourth Amendment cases, in which searches without individualized suspicion were permitted, because those cases involved far greater magnitudes of risks. The searches in those cases were responsive to situations in which "even one undetected instance of wrongdoing could have injurious consequences for a great

number of people," *Vernonia*, 515 U.S. at 675 (O'Connor, J., dissenting): as in the case of building inspections, "even a single safety code violation can cause 'fires and epidemics [that] ravage large urban areas[,]'" LaFave, *supra*, at 2578 (quoting *Camara*, 387 U.S. at 535), as in airport screening, "where even a single hijacked plane can result in the destruction of 'hundreds of human lives and millions of dollars of property,'" *id.* (quoting *United State v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974)), as in particular comprehensive drug-testing programs, in *Skinner* for example, "where a single drug-impaired train operator can produce 'disastrous consequences' including 'great human loss'" and property loss, *id.* (quoting *Skinner*, 489 U.S. at 628), "in *Von Raab*, where a customs official using drugs can cause the noninterdiction of a 'sizable' drug shipment and consequently injury to the lives of many, and perhaps a breach of 'national security,'" *id.* (quoting *Von Raab* 489 U.S. at 670, 674), and in *Vernonia* in which the subjects of the drug-testing program were children who had been committed to the temporary custody of the state as schoolmaster, who were subject to a greater degree of supervision and control than the state may exercise over free adults, and who had a lesser privacy expectation with regard to medical examinations and procedures than the general population, *Vernonia*, 515 U.S. 646.

Most important, the cases permitting a search without individualized suspicion "upheld the suspicionless search only after first recognizing the Fourth Amendment's

long-standing preference for a suspicion-based regime, and then pointing to sound reasons why such a regime would be ineffectual under the unusual circumstances presented." *Vernonia*, 515 U.S. at 674 (O'Connor, J., dissenting); *see also id.* at 674-75 (O'Connor, J., dissenting) (discussing cases); LaFave, *supra*, at 2578-79 (same). For example, the Court in *Camara* emphasized that an individualized suspicion test was impracticable for searches of homes for safety violations because evidence of code violations ordinarily was not observable from outside of the house, *Camara*, 387 U.S. at 537, while in *Bell v. Wolfish*, 441 U.S. 520, 560 n.40 (1979), the Court allowed suspicionless searches of prisoners following contact visits because the degree of scrutiny necessary to obtain individualized suspicion would cause "obvious disruption of the confidentiality and intimacy that these visits are intended to afford." Similarly, a requirement of individualized suspicion for testing train operators after an accident was not feasible in *Skinner* because "the scene of a serious rail accident is chaotic." *Skinner*, 489 U.S. at 631. In *Von Raab*, requiring suspicion for testing customs officials was unworkable because it was "not feasible to subject [such] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab*, 489 U.S. at 674. Finally, the Supreme Court's cases on border and airport searches may be distinguished because in those instances "authorities find themselves in essentially a now-or-never situation as to a large volume

22

of travelers who could not feasibly have been subjected to prior scrutiny."  LaFave, *supra*, at 2579;  *see United States v. Ramsey*, 431 U.S. 606 (1977); *United States v. Moreno*, 475 F.2d 44 (5th Cir. 1973).

By contrast, there is no comparable justification or precedent  for allowing the school board officials in the present case to order a janitor to submit to drug tests without individualized suspicion.  Aubrey, whose job title was "custodian" but whose duties are more aptly described as "janitorial," was susceptible to close supervision and/or observation by a custodian supervisor, a principal, a vice principal, school teachers, and other school workers.  There was no evidence that Aubrey's job involved more hazardous cleaning materials or equipment than that used by innumerable other ordinary janitorial workers.  I have been unable to find any support in the record for the majority's assertion that  Aubrey "constantly was in the presence of young students," which incorrectly implies that Aubrey's job was somehow distinguishable from that of an ordinary school janitor.  Plainly, there has been no showing that the reasonable individualized suspicion test would likely be ineffectual under the circumstances of Aubrey's janitorial employment.

The Supreme Court in *Chandler*, its most recent urinalysis drug test case, reaffirmed that "the Fourth Amendment requires  government to respect '[t]he right of people to be secure in their persons . . . against unreasonable searches and seizures,'"

23

*Chandler*, 520 U.S. at --, 117 S.Ct. at 1298, and that "[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing," *id.* at 1301 (citing *Vernonia*, 515 U.S. at 670). However, "'[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.'" *Id.* at 1301 (*quoting Skinner*, 489 U.S. at 624); *see also Von Raab*, 489 U.S. at 665-66.

The Court clearly indicated that *Skinner* and *Von Raab* must be read in their unique contexts. "*Skinner* concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train accidents." *Id.* "The FRA adopted the drug-testing program in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug- and alcohol- impaired employees and the incidence of train accidents." *Id.* Factors tending to offset the privacy concerns were that the regulations reduced intrusiveness; the fact that the industry was regulated pervasively for safety diminished privacy expectations; the surpassing safety risks and interests; the illegal drug and alcohol use by rail employees could "cause great human loss before any signs of impairment become noticeable to

24

supervisors"; the program helped obtain "invaluable information" about major train wreck causes and; an individualized suspicion requirement in the chaotic aftermath of a train accident would impede detection of causation. *Id.*

In *Von Raab*, drug interdiction had become the Customs Service's primary enforcement mission; the covered posts directly involved drug interdiction or otherwise required Customs officers to carry firearms; the employees had access to vast sources of contraband; officers had been targets and some had succumbed to bribery; and it was not feasible to subject Customs Service employees to the kind of day to day scrutiny that is the norm in more traditional work environments. *Chandler*, 117 S.Ct. at 1301-02.

In *Chandler* the Supreme Court also pointed out the set of unique circumstances in *Vernonia*, under which it had sustained a random sample drug-testing program for high school students engaged in interscholastic athletics, with written consent of each athlete's parents, during the season of each sport:  public school systems bear large responsibilities as "guardian and tutor" of children entrusted to their care,  there was "an 'immediate crisis' caused by a sharp increase in drug use in the school district," student athletes were "'leaders of the drug culture,'" "students within the school environment have a lesser expectation of privacy than members of the population generally," and it is important to deter drug use by school children and to reduce the

risk of injury caused by drug use among student athletes. *Id.* (quoting and citing *Vernonia*, 515 U.S. at 646).

According to the *Chandler* Court, *Skinner*, *Von Raab* and *Vernonia* establish that the government's "proffered special need for drug testing must be substantial-- important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 1303. The Supreme Court in *Chandler* rejected the state's invitation to apply a more deferential framework, stating that "[o]ur guides remain *Skinner, Von Raab*, and *Vernonia*." *Id*. at 1302.

Before *Chandler*, it was already very clear that the present case does not fit into the *Skinner - Von Raab - Vernonia* "Special Needs" category. For the reasons previously discussed, the present case is clearly distinguishable from other cases allowing suspicionless searches or seizures in terms of the nature of the intrusion, the magnitude of risks to human lives and property, and/or the practicability of application of the reasonable individualized suspicion test. *Chandler* confirms, however, that, in the present case, the governmentally proffered special need for suspicionless drug testing has not been demonstrated to be real, substantial or sufficiently vital to suppress "the Fourth Amendment's normal requirement of individualized suspicion[,]" *id*. at 1303, when measured by "[o]ur guides . . . *Skinner, Von Raab*, and *Vernonia*[,]" *id*.

26

at 1302.

First, the school board in the present case has not established that there was any demonstrated need for the suspicionless drug testing of janitors and other school workers. In *Skinner*, *Von Raab*, and *Vernonia*, the urinalysis tests were administered pursuant to well defined programs established by governmentally promulgated regulations or written policy statements based on documented needs, not upon the pure *ipse dixit* of local government officials. In *Vernonia*, the drug testing was also authorized by the written consent of the parents of each student-athlete, which consent was obtained as a condition precedent to participation in interscholastic athletics.

Second, there has been no demonstration in the present case that public safety is genuinely in jeopardy or that there is a critical and immediate need to suppress the Fourth Amendment's normal requirement of individualized suspicion. Unlike the situation presented in *Skinner*, the record here indicates that the school board has not undertaken any kind of study, much less a systematic study, of drug abuse by janitors and other school workers. Consequently, the school board had not established a documented link between drug abuse by janitors and other school workers and any school accident or exposure of children to drugs. Further, the record does not reflect that school janitors participate in an industry that is regulated pervasively to ensure safety. There was no indication of a surpassing safety interest in guarding against the

27

risk that janitors would cause loss of large numbers of human lives and millions of dollars of property damage due to drug use before any signs of impairment would become noticeable to supervisors. There was no evidence that the individualized suspicion requirement for a drug test of janitors would seriously impede the employer's ability to identify and eliminate or rehabilitate drug-impaired janitors.

The present case, involving a school janitor, in contrast with *Von Raab*, does not involve a Customs law enforcement officer who is directly involved in drug interdiction, required to carry firearms, given access to vast sources of contraband, exposed to the risk of bribery and blackmail by illegal drug traffickers, capable of facilitating importation of sizable drug shipments or blocking the apprehension of dangerous criminals, and engaged in a mission that is not susceptible to day-to-day scrutiny and supervision as in more traditional work environments. *See Von Raab*, 489 U.S. at 670-674.

Finally, the present case, which is quite distinguishable from *Vernonia*, involves a free adult janitorial worker employed in the mundane job of maintaining school buildings and grounds, not high school and junior high school student athletes, who as students within the school environment have a lesser expectation of privacy than members of the population generally, and to whom the public school system owes a duty, as guardian and tutor of children entrusted to its care, to protect from moral

28

corruption and physical injury due to drug use, especially during an immediate crisis caused by a sharp increase in drug use in the school district. *See Vernonia*, 515 U.S. at 654-664.

In sum, the record in the present case is notably lacking in the presentation of a concrete danger demanding departure from the Fourth Amendment's main rule that, to be reasonable under the Fourth Amendment, a search must be based on individualized suspicion. *See Chandler*, 117 S.Ct. at 1303.

Moreover, the majority's decision conflicts with *United Teachers v. Orleans and Jefferson Parish School Boards*, 142 F.3d 853 (5th Cir. 1998), in which this court held unconstitutional, under *Chandler's* (*Skinner - Von Raab - Vernonia* based) "special needs" analysis, similar programs for the suspicionless urinalysis testing of school board employees. The rules of two parish school boards required employees injured in the course of employment to submit to urine tests. The rules were not based upon any identified problem of drug use by teachers or their teachers' aids or clerical workers. This court concluded that the school boards had failed to show "[any] legal justification for insisting upon drug testing urine without a showing of individualized suspicion of wrongdoing in a given case, certainly nothing beyond the ordinary needs of law enforcement." *Id.* at 857. The court explained:

Special needs are just that, special, an exception to the command of the

Fourth Amendment. It cannot be the case that a state's preference for means of detection is enough to waive off the protections of privacy afforded by insisting upon individualized suspicion. It is true that the principles we apply are not absolute in their restraint of government, but it is equally true that they do not kneel to the convenience of government, or allow their teaching to be so lightly slipped past. Surely then it is self-evident that we cannot rest upon the rhetoric of the drug wars. As destructive as drugs are and as precious are the charges of our teachers, special needs must rest on demonstrated realities. Failure to do so leaves the effort to justify this testing as responsive to drugs in public schools as a "kind of immolation of privacy and human dignity in symbolic opposition to drug use," that troubled Justice Scalia in *Von Raab*.

*Id.* (quoting *Von Raab*, 489 U.S. at 681 (Scalia, J., dissenting)).

The school board in the present case has offered no more special needs or legal justification for insisting upon drug urine testing without a showing of individualized suspicion of wrongdoing in a given case than the school boards did in *United Teachers*. The testing in the present case does not respond to any identified problem of drug use by janitors or other school workers. Instead, it rests only on the school board's "preference for means of detection [without] the protections of privacy afforded by

insisting upon individualized suspicion" and the "rhetoric of the drug wars," rather than on the "demonstrated realities," *id.*, that are required to establish "special needs" for suspicionless urinalysis testing of employees under *Chandler*, *Skinner*, *Von Raab* and *Vernonia*.

ENDRECORD

DENNIS, Circuit Judge, dissenting.

I disagree with the majority's conclusion that the school board has shown that this case falls within the closely guarded "special needs" category recently recognized by the Supreme Court within which state officials without reasonable individualized suspicion of wrongdoing may require a person to submit to an urinalysis drug test. In this case the school board, without reasonable individualized suspicion that a janitor's urine contained evidence of illegal drug usage, randomly selected and ordered him to submit to a urinalysis drug test, on pain of disciplinary action which could result in termination. The janitor was subjected to urinalysis under the school board's random drug-testing program, which appears to cover mandatorily all manual labor school board employees, while notably omitting any such requirement of teachers, principals, and administrative and clerical personnel.

The school board compelled drug test effected a search within the meaning of the Fourth and Fourteenth Amendments. The decisions of the Supreme Court clearly require that state officials have an individualized reasonable suspicion that illegal drug use evidence is contained in a person's urine before ordering him to submit to an urinalysis drug test. The majority's erroneous conclusion that the state's proffered

32

"special need" for drug testing justified the suppression of the Fourth Amendment's normal requirement of individualized suspicion led to its mistaken affirmance of the district court's summary judgment rejecting the janitor's petition for injunctive relief and damages. The majority's decision also conflicts in principle with a previous decision of this court. Accordingly, I respectfully dissent.

That the school board's actions invaded an expectation of privacy that society is prepared to recognize as reasonable is not disputed. "'There are few activities in our society more personal or private than the passing of urine. Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.'" *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 617 (1989) (quoting *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 175 (5th Cir. 1987)). "Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment." *Id.* (footnote omitted).

The decisions of the Supreme Court require that state officials have an individualized reasonable suspicion that a person's urine contains evidence of illegal

drug use before ordering him to submit to an urinalysis drug test. The Supreme Court, in *Skinner v. Railway Labor Executives Association*, 489 U.S. 602 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), recognized a "special needs" category of cases involving train operators and Customs Service agents and permitted suspicionless government mandated urinalysis of such persons under the particular and unique circumstances and regulated drug testing programs in those cases. Previously, Supreme Court Justices, in dicta and separate opinions, had spoken of "special needs" in contexts other than urinalysis drug testing but clearly had not designated a "special needs" category for suspicionless searches or seizures. Subsequent to *Skinner* and *Von Raab* the Supreme Court, in *Vernonia School District 47J v. Acton,* 515 U.S. 646 (1995), recognized a "special needs" category for suspicionless random sample urinalysis of secondary school athletes, who, as a condition of eligibility for interscholastic athletics, had signed forms consenting to the test and had obtained written consent from their parents, under the particular, unique circumstances involving an "immediate crisis" caused by a sharp increase in drug use by students.

Recently, in *Chandler v. Miller*, 520 U.S.---, 117 S.Ct. 1295 (1997), the Supreme Court held that a state's statutory requirement that candidates for state office submit to an urinalysis drug test does not fit within the closely guarded "special needs"

category of constitutionally permissible suspicionless searches established by *Skinner*, *Von Raab*, and *Vernonia* and that those precedents remain the guides for determining whether any proffered "special needs" for suspicionless drug testing passes constitutional muster. In the present case, it is clear that the school board's requirement that an adult janitorial worker submit to urinalysis drug testing, which was not based on reasonable individualized suspicion, did not fit within the closely guarded "special needs" category of constitutionally permissible suspicionless searches, because the random drug test order was not supported by a showing of any of the factors necessary to justify a "special needs" category and suspicionless drug testing policy or program.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Until the late 1960's, the steadfast rule was that in order for a search to be "reasonable," law enforcement officials must first obtain a warrant from a neutral and detached magistrate by establishing probable cause that a law had been violated, and

that in the few specific situations in which obtaining a warrant was deemed impracticable probable cause was still required. *See, e.g., Carroll v. United States*, 267 U.S. 132 (1925); *Agnello v. United States*, 269 U.S. 20 (1925). As the Supreme Court considered nontraditional applications of the Fourth Amendment, however, such as searches by public inspections officials, *see Camara v. Municipal Court*, 387 U.S. 523 (1967), and frisks by police officers, *see Terry v. Ohio*, 392 U.S. 1 (1968), it found it needed more flexibility than the warrant and probable cause requirements could provide. The Court began, in limited circumstances, to recognize specific permissible departures from the traditional probable cause requirement, after "balancing the need to search against the invasion which the search entails". *Camara*, 387 U.S. at 537; *accord Terry*, 392 U.S. at 21. "Those departures have been of two different kinds: (1) [those] requiring only lesser individualized suspicion, [and] (2) [those] requiring no individualized suspicion but only a random or other nonarbitrary selection process[.]" Wayne R. LaFave, *Computers, Urinals, and the Fourth Amendment: Confessions of a Patron Saint*, 94 MICH. L. REV. 2553, 2575-1576 (1996)[hereinafter LaFave]; *cf. Terry*, 392 U.S. 1; *Camara*, 387 U.S. 523.

Each situation in which the Supreme Court has created an exception that allows an intrusion without reasonable individualized suspicion is markedly different from the school board mandated urinalysis test situation in the present case. In comparison,

each of those cases is clearly distinguishable from the present case on one or more of the following grounds: (1) the nature of the intrusion was much less severe; (2) the magnitude of the governmental need for the search was far greater; and/or (3) it was impracticable or impossible to respond to the governmental need with the individualized suspicion requirement. *See* LaFave, *supra*, at 2577 (citing and referencing cases).

For example, the premises inspection cases do not involve a serious intrusion upon personal privacy because even the housing inspections, and especially the business inspections, are not "personal in nature." *Camara*, 387 U.S. at 537. "The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas and electrical systems, and toward the accumulation of garbage and debris, and there is no rummaging through private papers and effects of the householder." LaFave, *supra*, at 2577-78. The search at issue in the present case, by contrast, is extremely personal in nature because it intrudes upon "an excretory function traditionally shielded by great privacy." *Skinner*, 489 U.S. at 626; *see also* LaFave, *supra*, at 2577-78 (discussing similar type of search in *Acton*).

The present case is distinguishable from the "special needs" urinalysis cases, and from other Fourth Amendment cases, in which searches without individualized suspicion were permitted, because those cases involved far greater magnitudes of risks.

The searches in those cases were responsive to situations in which "even one undetected instance of wrongdoing could have injurious consequences for a great number of people," *Vernonia*, 515 U.S. at 675 (O'Connor, J., dissenting): as in the case of building inspections, "even a single safety code violation can cause 'fires and epidemics [that] ravage large urban areas[,]'" LaFave, *supra*, at 2578 (quoting *Camara*, 387 U.S. at 535), as in airport screening, "where even a single hijacked plane can result in the destruction of 'hundreds of human lives and millions of dollars of property,'" *id.* (quoting *United State v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974)), as in particular comprehensive drug-testing programs, in *Skinner* for example, "where a single drug-impaired train operator can produce 'disastrous consequences' including 'great human loss'" and property loss, *id.* (quoting *Skinner*, 489 U.S. at 628), "in *Von Raab*, where a customs official using drugs can cause the noninterdiction of a 'sizable' drug shipment and consequently injury to the lives of many, and perhaps a breach of 'national security,'" *id.* (quoting *Von Raab* 489 U.S. at 670, 674), and in *Vernonia* in which the subjects of the drug-testing program were children who had been committed to the temporary custody of the state as schoolmaster, who were subject to a greater degree of supervision and control than the state may exercise over free adults, and who had a lesser privacy expectation with regard to medical examinations and procedures than the general population, *Vernonia*, 515 U.S. 646.

Most important, the cases permitting a search without individualized suspicion "upheld the suspicionless search only after first recognizing the Fourth Amendment's long-standing preference for a suspicion-based regime, and then pointing to sound reasons why such a regime would be ineffectual under the unusual circumstances presented." *Vernonia*, 515 U.S. at 674 (O'Connor, J., dissenting); *see also id.* at 674-75 (O'Connor, J., dissenting) (discussing cases); LaFave, *supra*, at 2578-79 (same). For example, the Court in *Camara* emphasized that an individualized suspicion test was impracticable for searches of homes for safety violations because evidence of code violations ordinarily was not observable from outside of the house, *Camara*, 387 U.S. at 537, while in *Bell v. Wolfish*, 441 U.S. 520, 560 n.40 (1979), the Court allowed suspicionless searches of prisoners following contact visits because the degree of scrutiny necessary to obtain individualized suspicion would cause "obvious disruption of the confidentiality and intimacy that these visits are intended to afford." Similarly, a requirement of individualized suspicion for testing train operators after an accident was not feasible in *Skinner* because "the scene of a serious rail accident is chaotic." *Skinner*, 489 U.S. at 631. In *Von Raab*, requiring suspicion for testing customs officials was unworkable because it was "not feasible to subject [such] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab*, 489 U.S. at 674. Finally, the Supreme Court's cases

39

on border and airport searches may be distinguished because in those instances "authorities find themselves in essentially a now-or-never situation as to a large volume of travelers who could not feasibly have been subjected to prior scrutiny." LaFave, *supra*, at 2579; *see United States v. Ramsey*, 431 U.S. 606 (1977); *United States v. Moreno*, 475 F.2d 44 (5th Cir. 1973).

By contrast, there is no comparable justification or precedent for allowing the school board officials in the present case to order a janitor to submit to drug tests without individualized suspicion. Aubrey, whose job title was "custodian" but whose duties are more aptly described as "janitorial," was susceptible to close supervision and/or observation by a custodian supervisor, a principal, a vice principal, school teachers, and other school workers. There was no evidence that Aubrey's job involved more hazardous cleaning materials or equipment than that used by innumerable other ordinary janitorial workers. I have been unable to find any support in the record for the majority's assertion that Aubrey "constantly was in the presence of young students," which incorrectly implies that Aubrey's job was somehow distinguishable from that of an ordinary school janitor. Plainly, there has been no showing that the reasonable individualized suspicion test would likely be ineffectual under the circumstances of Aubrey's janitorial employment.

The Supreme Court in *Chandler*, its most recent urinalysis drug test case,

40

reaffirmed that "the Fourth Amendment requires government to respect '[t]he right of people to be secure in their persons . . . against unreasonable searches and seizures,'" *Chandler*, 520 U.S. at --, 117 S.Ct. at 1298, and that "[t]o be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing," *id.* at 1301 (citing *Vernonia*, 515 U.S. at 670). However, "'[i]n limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.'" *Id.* at 1301 (*quoting Skinner*, 489 U.S. at 624); *see also Von Raab*, 489 U.S. at 665-66.

The Court clearly indicated that *Skinner* and *Von Raab* must be read in their unique contexts. "*Skinner* concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train accidents." *Id.* "The FRA adopted the drug-testing program in response to evidence of drug and alcohol abuse by some railroad employees, the obvious safety hazards posed by such abuse, and the documented link between drug- and alcohol- impaired employees and the incidence of train accidents." *Id.* Factors tending to offset the privacy concerns were that the regulations reduced intrusiveness; the fact that the industry was regulated pervasively for safety diminished privacy expectations; the

41

surpassing safety risks and interests; the illegal drug and alcohol use by rail employees could "cause great human loss before any signs of impairment become noticeable to supervisors"; the program helped obtain "invaluable information" about major train wreck causes and; an individualized suspicion requirement in the chaotic aftermath of a train accident would impede detection of causation. *Id.*

In *Von Raab*, drug interdiction had become the Customs Service's primary enforcement mission; the covered posts directly involved drug interdiction or otherwise required Customs officers to carry firearms; the employees had access to vast sources of contraband; officers had been targets and some had succumbed to bribery; and it was not feasible to subject Customs Service employees to the kind of day to day scrutiny that is the norm in more traditional work environments. *Chandler*, 117 S.Ct. at 1301-02.

In *Chandler* the Supreme Court also pointed out the set of unique circumstances in *Vernonia*, under which it had sustained a random sample drug-testing program for high school students engaged in interscholastic athletics, with written consent of each athlete's parents, during the season of each sport: public school systems bear large responsibilities as "guardian and tutor" of children entrusted to their care, there was "an 'immediate crisis' caused by a sharp increase in drug use in the school district," student athletes were "'leaders of the drug culture,'" "students within the school

environment have a lesser expectation of privacy than members of the population generally," and it is important to deter drug use by school children and to reduce the risk of injury caused by drug use among student athletes. *Id.* (quoting and citing *Vernonia*, 515 U.S. at 646).

According to the *Chandler* Court, *Skinner*, *Von Raab* and *Vernonia* establish that the government's "proffered special need for drug testing must be substantial-- important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Id.* at 1303. The Supreme Court in *Chandler* rejected the state's invitation to apply a more deferential framework, stating that "[o]ur guides remain *Skinner, Von Raab*, and *Vernonia*." *Id*. at 1302.

Before *Chandler*, it was already very clear that the present case does not fit into the *Skinner - Von Raab - Vernonia* "Special Needs" category. For the reasons previously discussed, the present case is clearly distinguishable from other cases allowing suspicionless searches or seizures in terms of the nature of the intrusion, the magnitude of risks to human lives and property, and/or the practicability of application of the reasonable individualized suspicion test. *Chandler* confirms, however, that, in the present case, the governmentally proffered special need for suspicionless drug testing has not been demonstrated to be real, substantial or sufficiently vital to suppress

43

"the Fourth Amendment's normal requirement of individualized suspicion[,]" *id.* at 1303, when measured by "[o]ur guides . . . *Skinner, Von Raab*, and *Vernonia*[,]" *id.* at 1302.

First, the school board in the present case has not established that there was any demonstrated need for the suspicionless drug testing of janitors and other school workers. In *Skinner*, *Von Raab*, and *Vernonia*, the urinalysis tests were administered pursuant to well defined programs established by governmentally promulgated regulations or written policy statements based on documented needs, not upon the pure *ipse dixit* of local government officials. In *Vernonia*, the drug testing was also authorized by the written consent of the parents of each student-athlete, which consent was obtained as a condition precedent to participation in interscholastic athletics.

Second, there has been no demonstration in the present case that public safety is genuinely in jeopardy or that there is a critical and immediate need to suppress the Fourth Amendment's normal requirement of individualized suspicion. Unlike the situation presented in *Skinner*, the record here indicates that the school board has not undertaken any kind of study, much less a systematic study, of drug abuse by janitors and other school workers. Consequently, the school board had not established a documented link between drug abuse by janitors and other school workers and any school accident or exposure of children to drugs. Further, the record does not reflect

44

that school janitors participate in an industry that is regulated pervasively to ensure safety. There was no indication of a surpassing safety interest in guarding against the risk that janitors would cause loss of large numbers of human lives and millions of dollars of property damage due to drug use before any signs of impairment would become noticeable to supervisors. There was no evidence that the individualized suspicion requirement for a drug test of janitors would seriously impede the employer's ability to identify and eliminate or rehabilitate drug-impaired janitors.

The present case, involving a school janitor, in contrast with *Von Raab*, does not involve a Customs law enforcement officer who is directly involved in drug interdiction, required to carry firearms, given access to vast sources of contraband, exposed to the risk of bribery and blackmail by illegal drug traffickers, capable of facilitating importation of sizable drug shipments or blocking the apprehension of dangerous criminals, and engaged in a mission that is not susceptible to day-to-day scrutiny and supervision as in more traditional work environments. *See Von Raab*, 489 U.S. at 670-674.

Finally, the present case, which is quite distinguishable from *Vernonia*, involves a free adult janitorial worker employed in the mundane job of maintaining school buildings and grounds, not high school and junior high school student athletes, who as students within the school environment have a lesser expectation of privacy than

45

members of the population generally, and to whom the public school system owes a duty, as guardian and tutor of children entrusted to its care, to protect from moral corruption and physical injury due to drug use, especially during an immediate crisis caused by a sharp increase in drug use in the school district. *See Vernonia*, 515 U.S. at 654-664.

In sum, the record in the present case is notably lacking in the presentation of a concrete danger demanding departure from the Fourth Amendment's main rule that, to be reasonable under the Fourth Amendment, a search must be based on individualized suspicion. *See Chandler*, 117 S.Ct. at 1303.

Moreover, the majority's decision conflicts with *United Teachers v. Orleans and Jefferson Parish School Boards*, 142 F.3d 853 (5th Cir. 1998), in which this court held unconstitutional, under *Chandler's* (*Skinner - Von Raab - Vernonia* based) "special needs" analysis, similar programs for the suspicionless urinalysis testing of school board employees. The rules of two parish school boards required employees injured in the course of employment to submit to urine tests. The rules were not based upon any identified problem of drug use by teachers or their teachers' aids or clerical workers. This court concluded that the school boards had failed to show "[any] legal justification for insisting upon drug testing urine without a showing of individualized suspicion of wrongdoing in a given case, certainly nothing beyond the ordinary needs

of law enforcement." *Id.* at 857.  The court explained:

> Special needs are just that, special, an exception to the command of the Fourth Amendment.  It cannot be the case that a state's preference for means of detection is enough to waive off the protections of privacy afforded by insisting upon individualized suspicion.  It is true that the principles we apply are not absolute in their restraint of government, but it is equally true that they do not kneel to the convenience of government, or allow their teaching to be so lightly slipped past.  Surely then it is self-evident that we cannot rest upon the rhetoric of the drug wars.  As destructive as drugs are and as precious are the charges of our teachers, special needs must rest on demonstrated realities.  Failure to do so leaves the effort to justify this testing as responsive to drugs in public schools as a "kind of immolation of privacy and human dignity in symbolic opposition to drug use," that troubled Justice Scalia in *Von Raab*.

*Id.* (quoting *Von Raab*, 489 U.S. at 681 (Scalia, J., dissenting).

The school board in the present case has offered no more special needs or legal justification for insisting upon drug urine testing without a showing of individualized suspicion of wrongdoing in a given case than the school boards did in *United Teachers*.  The testing in the present case does not respond to any identified problem of drug use

47

by janitors or other school workers. Instead, it rests only on the school board's "preference for means of detection [without] the protections of privacy afforded by insisting upon individualized suspicion" and the "rhetoric of the drug wars," rather than on the "demonstrated realities," *id.*, that are required to establish "special needs" for suspicionless urinalysis testing of employees under *Chandler*, *Skinner*, *Von Raab* and *Vernonia*.